Filed 12/27/18; Opinion following rehearing

CERTIFIED FOR PUBLICATION

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FOUR

| | |
|---|---|
| JASON OLIVE, | B279490 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC482686) |
| v. | |
| GENERAL NUTRITION CENTERS, INC., | |
| Defendant and Appellant. | |

APPEAL from a judgment and order of the Superior Court of Los Angeles County, John Shepard Wiley, Jr., Judge. Affirmed.

Johnson & Johnson, Neville L. Johnson, Douglas L. Johnson and Ronald P. Funnell; Hamideh Firm and Bassil A. Hamideh for Plaintiff and Appellant.

McGuire Woods, Leslie M. Werlin, James F. Neale and Molly M. White for Defendant and Appellant.

_____

Jason Olive is a model and actor who contracted with General Nutrition Centers, Inc. (GNC) to use his likeness in its advertising campaign. GNC continued using Olive's likeness in its advertising after its right to do so expired. GNC admitted liability for the unauthorized use of Olive's likeness in violation of Civil Code section 3344[1] but contested the amount of damages. A jury found Olive suffered $213,000 in actual damages and $910,000 in emotional distress damages. The trial court denied both parties' motions for prevailing party attorney fees and costs.

Both Olive and GNC separately appeal from the judgment and the order denying prevailing party attorney fees. Olive contends the court erred by (1) failing to provide his proposed special jury instruction concerning the burden of proof under section 3344, (2) excluding his expert witnesses who would have testified about the amount of GNC's profits from the unauthorized use of his likeness, and (3) determining he was not the prevailing party for purposes of awarding statutory attorney fees. In its cross-appeal, GNC contends it should have been deemed to be the prevailing party.[2] We affirm both the judgment and the order denying attorney fees.

---

[1] The statute prohibits the knowing use of another person's likeness in any manner, including for the purposes of advertising, without such person's consent. (Civ. Code, § 3344, subd. (a).)

All undesignated section references are to the Civil Code.

[2] In its opening brief, GNC additionally claimed the trial court erred by denying its motion for judgment notwithstanding the verdict. GNC abandoned this claim in its reply brief, and we therefore do not address it.

2

# FACTUAL AND PROCEDURAL SUMMARY

*Olive's Background*

Olive is a model, former professional volleyball player, and actor. His previous modeling engagements included campaigns for Ralph Lauren, Levi's, Versace, Armani, Calvin Klein, Elle Magazine, and GQ Magazine. Olive reached the peak of his modeling career in the mid-1990's, when he was in his twenties. He earned up to $25,000 per day for modeling work during the height of his career.

Olive's modeling career has waned since that time, and he turned to acting around 2010. He was featured in Tyler Perry's hit television show "For Better or Worse" in 2011.

*GNC's New Marketing Campaign*

GNC is an international retailer and manufacturer of vitamins and other nutritional supplements, with approximately 8,000 retail locations. GNC has used the "Live Well" marketing tagline in its advertising and marketing materials since approximately 1998. The slogan is meant to encourage customers "to live a better life."

In 2010, GNC hired photographer Peter Arnell to carry out a photo shoot for its new "Live Well" advertising campaign. GNC was looking for models who were athletic, healthy, ethnically diverse, and "everyday relatable people." GNC gave Arnell a budget but otherwise had no direct role in the photo shoot, including casting and securing proper release agreements.

3

*Olive is Cast as a Model for GNC's "Live Well" Campaign*

Olive's agent, Richard Ferrari, submitted him as a candidate for GNC's "Live Well" campaign. Compensation for the photo shoot was posted at $6,000 but Ferrari sought a higher rate. Arnell had a limited budget and refused to negotiate for a higher fee. Olive and approximately 15 other models were cast for the photo shoot.

Olive executed a "Photograph and Likeness Release" on September 24, 2010. The agreement irrevocably granted GNC the "absolute right, permission, authorization and consent to use, reuse, produce, reproduce, exploit, publish, republish, display and otherwise use and reuse [his] image and likeness and photograph to be taken at the photoshoot scheduled for September 24, 2010." Olive was paid $4,000 for the three-hour photoshoot, in addition to an $800 agent fee. The release lasted for one year from GNC's first usage in print media, and GNC had the unilateral right to a one-year renewal in exchange for the same amount of compensation.

In November 2010, Olive executed a second "Photograph and Likeness Release" allowing GNC to use his image and likeness on print media displayed on any company trucks and other vehicles in North America. Olive was paid $8,000 for this agreement, which is valid through December 31, 2021.

GNC's marketing team approved Arnell's selections. GNC launched its new advertising campaign in January 2011. Olive's image was used in outdoor billboards, bus shelters, kiosks, social media websites, direct mail advertising, as well as in-store posters and signage. Olive was "shocked" and "angered" when he discovered the vast scope of the advertising campaign. Olive believed he agreed to "a very small job" in light of what he

4

perceived to be a small fee, and he felt he was doing a favor for the Arnell Agency.

In May 2011, GNC decided to pursue a new photo shoot in an effort to update its promotional graphics. GNC wanted its new approach to resonate with updates to its stores. None of the models from the September photo shoot, including Olive, were invited to the new shoot.

GNC terminated its relationship with the Arnell Agency after Arnell's principals divorced. GNC expected the agency would continue managing the models it used and maintain any outstanding release agreements. GNC did not immediately hire a replacement advertising agency, and no one was tasked with keeping track of model release agreements.

*GNC's Right to Use Olive's Likeness Expires*

GNC declined to renew the release agreement, and Olive told Ferrari he wanted to end his relationship with GNC. On January 9, 2012, Ferrari emailed GNC to confirm it was no longer authorized to continue using Olive's image.[3] He never received a response. Olive eventually fired Ferrari.

Celina Petronzi, an employee in GNC's marketing department, was tasked with responding to Ferrari's inquiry, but she failed to do so. Petronzi emailed GNC's Vice President of marketing, informing her that some talent from the September 2010 Arnell photo shoot was going to expire, and asking about

_____

[3] It is unclear exactly when the release term expired. Olive contends the term expired at the end of November 2011, whereas GNC contends it expired "at the end of 2011." Nevertheless, it is undisputed that GNC's right to use Olive's likeness expired sometime in late 2011 or early 2012.

what imagery would be used going forward.  The marketing department was unaware that the releases had expired and was not familiar with Olive.

After discovering the oversight, GNC negotiated extensions for every model used in the September 2010 shoot, except Olive.  The company was prepared to replace the images of any model who "was difficult" during negotiation.  GNC paid between $7,500 and $32,000 to the models in exchange for five-year extensions.  GNC retained a new advertising agency in April 2012.

GNC continued its efforts to negotiate a release extension with Olive, but he refused and instead filed suit.  Later in 2012, GNC attempted a last ditch effort to negotiate an extension with Olive for $150,000.  Olive rejected the offer.  GNC removed Olive's image from its marketing materials in either November or December of 2012, incurring approximately $350,000 in take-down expenses.

*Olive's Complaint and GNC's Answer*

Olive's complaint alleged causes of action for common law misappropriation of likeness and statutory misappropriation of likeness (§ 3344).  He also sought restitution for unjust enrichment.  Pursuant to section 3344, subdivision (a), Olive requested disgorgement of any profits from GNC's unauthorized use of his image.  GNC initially denied Olive's allegations, but it admitted liability for the unauthorized use of Olive's image prior to trial.

*GNC's Motions In Limine*

Olive designated three experts to offer their opinions regarding GNC's profits attributable to its unauthorized use of

his image: (1) Weston Anson; (2) Leonard Lyons; and (3) Jeff Anderson.  GNC moved in limine to exclude Anson and Lyons from testifying at trial.[4]

GNC sought to exclude Anson from opining as to Olive's damages and the apportionment of GNC's profits to its use of his image.  The company argued Anson's opinions were speculative and unreliable.  GNC also sought to exclude Lyons because his opinion was based on Anson's speculative and flawed analysis.  Following a hearing, the trial court granted GNC's in limine motions to exclude Anson and Lyons.

*Jury Verdict and Judgment*

The jury ultimately awarded Olive a total of $1,123,000 in damages, consisting of $213,000 in actual damages and $910,000 in emotional distress damages.  The jury found that Olive failed to prove any of GNC's profits were attributable to the unauthorized use of his image, and that GNC had not acted with malice or fraud.  The trial court separately returned a defense verdict on Olive's equitable claim for unjust enrichment.  The court denied GNC's motion for a new trial and for judgment notwithstanding the verdict on the jury's emotional distress damages verdict.

---

[4] Anderson is the Director of Valuation and Analytics at Anson's firm.  GNC did not move to exclude Anderson as an expert.  Olive contended at oral argument that he did not call Anderson as a witness because he had only generated data used by Anson.

7

*Motion for Attorney Fees and Costs*

Both parties moved for statutory prevailing party costs and attorney's fees pursuant to section 3344, subdivision (a). The trial court noted that both parties were visibly disappointed after the jury rendered its verdict. It found there was no prevailing party because "the jury accepted neither side's recommendation but instead awarded a middling sum amounting to a tie."

## DISCUSSION

A. <u>The Trial Court Correctly Rejected Olive's Proposed Special Jury Instruction</u>

Olive contends the trial court erred by rejecting his proposed special jury instruction regarding the burden to apportion GNC's profits associated with the unauthorized use of his likeness. We disagree.

### 1. *Law Governing Jury Instructions and Standard of Review*

A party in a civil case is, upon request, entitled to correct jury instructions on every theory of the case that is supported by substantial evidence. (*Eng v. Brown* (2018) 21 Cal.App.5th 675, 704.) "It is elementary that a court may refuse a party's request for a jury instruction that misstates the law. 'A trial court has no duty to modify or edit an instruction offered by either side in a civil case. If the instruction is incomplete or erroneous the trial judge may, as he did here, properly refuse it.' [Citations.]" (*Ibid*; accord, *Bullock v. Philip Morris USA, Inc.* (2008) 159 Cal.App.4th 655, 685.)

8

An instruction that clarifies the application of statutory language may not add to the words of a statute. (*Torres v. Parkhouse Tire Service, Inc*. (2001) 26 Cal.4th 995, 1003–1004.) We review the legal adequacy of jury instructions under the de novo standard of review. (*Eng v. Brown*, *supra*, 21 Cal.App.5th at p. 704.)

### 2. *Section 3344 and CACI No. 1821*

In any action brought under section 3344, the injured party is entitled to collect any profits that are attributable to the defendant's unauthorized use of his or her likeness. (§ 3344, subd. (a).) "In establishing such profits, the injured party or parties are required to present proof only of the gross revenue attributable to such use, and the person who violated this section is required to prove his or her deductible expenses." (*Ibid*.)

CACI No. 1821 is the standard instruction for the jury to determine damages arising from a statutory misappropriation of likeness claim under section 3344. Pertinent here, the instruction provides:

"In addition, [name of plaintiff] may recover any profits that [name of defendant] received from the use of [name of plaintiff]'s [name/voice/signature/photograph/likeness] [that have not already been taken into account with regard to the above damages]. To establish the amount of these profits you must:

> 1. Determine the gross, or total, revenue that [name of defendant] received from the use;
> 2. Determine the expenses that [name of defendant] had in obtaining the gross revenue; and
> 3. Deduct [name of defendant]'s expenses from the gross revenue.

9

[Name of plaintiff] must prove the amount of gross revenue, and [name of defendant] must prove the amount of expenses." (CACI No. 1821.)

### 3. Olive's Proposed Special Instruction

Olive initially requested the trial court include CACI No. 1821 in his proposed instructions. He correctly proposed that "Jason Olive must prove the amount of gross revenue, and GNC must prove the amount of expenses." Olive later moved to amend the instruction to additionally require GNC to prove "the portion of revenue that is attributable to factors other than the use of [Olive's likeness]" after the trial court granted GNC's in limine motions to exclude Anson and Lyons. Olive argued that without his proposed supplemental language, the jury would be confused about the burden to apportion profits and would misapply the law.

Following a hearing, the trial court denied Olive's motion. The court determined that section 3344 unequivocally placed the burden on Olive to present proof of GNC's gross revenue attributable to its use of his likeness. The court also rejected Olive's reliance on federal copyright law.

### 4. CACI No. 1821 Tracks the Language of Section 3344

Olive contends the court erred because CACI No. 1821 did not adequately explain the parties' respective burdens of proof under section 3344, thus necessitating a further instruction guiding the jury on how to arrive at damages for GNC's profits attributable to the infringement. He is incorrect.

The statutory language of section 3344 is unambiguous— the plaintiff bears the burden of presenting proof of the gross

10

revenue attributable to defendant's unauthorized use of the plaintiff's likeness, and the defendant must then prove its deductible expenses.  (§ 3344, subd. (a).)  CACI No. 1821 mirrors the language of section 3344: "[plaintiff] must prove the amount of gross revenue, and [. . . defendant] must prove the amount of expenses."  (CACI No. 1821.)

The special instruction proposed by Olive flips that statutory language on its head.  Under that instruction, GNC would have to prove the amount of its gross revenue not attributable to its use of Olive's likeness, a figure that could not be calculated without first determining the company's total gross revenue.  The remaining figure, of course, would be GNC's calculation of the amount of gross revenue that was attributable to its use of Olive's likeness.  Not only is this directly contrary to the unambiguous statutory command that Olive had to prove the amount of revenue attributable to GNC's use of his likeness, it would create the absurd result of effectively placing on each party the burden to prove the same disputed fact.

Therefore, contrary to Olive's contention, CACI No. 1821 adequately explained the applicable law to the jury.  It is elementary that a court may refuse a proposed instruction that incorrectly states the law.  (*Eng v. Brown*, *supra*, 21 Cal.App.5th at p. 704; *Bullock v. Philip Morris USA, Inc.*, *supra*, 159 Cal.App.4th at pp. 684–685.)  Moreover, a court may properly refuse a proposed instruction if other instructions given adequately cover the law.  (*Bullock*, at p. 685; *Arato v. Avedon* (1993) 5 Cal.4th 1172, 1189, fn. 11.)  The court was correct in rejecting Olive's proposed supplemental instruction as unnecessary and misleading.

11

Olive also supports his claim of instructional error by citations to federal copyright, patent and trademark law, pointing to the legislative history of section 3344, which he contends states: "The rationale for the right of publicity, namely the encouragement of personal achievement for the ultimate benefit of society, is closely analogous to the rationale for copyright protection under the U.S. Constitution."

We reject this comparison. First, Olive appears to cite to nothing more than the bill number of a 1984 amendment to the statute, and has not provided us with either a proper legislative history citation to the material he asks us to consider or a copy of the relevant document.

Second, as previously discussed, the language of section 3344 is clear and unambiguous. "[W]hen the words of a statute are unambiguous, we need not turn to any extrinsic sources. [Citation.]" (*City of Montclair v. Cohen* (2018) 20 Cal.App.5th 238, 250.) "In such a case, there is nothing for the court to interpret or construe. [Citation.]" (*MacIsaac v. Waste Management Collection & Recycling, Inc.* (2005) 134 Cal.App.4th 1076, 1082.) State courts of appeal will resort to federal law for guidance only in the absence of relevant state precedent. (*Stephen v. Enterprise Rent-A-Car* (1991) 235 Cal.App.3d 806, 814.)

Section 3344 could not be clearer as to which party bears the burden to prove GNC's profits attributable to the unauthorized use of Olive's image. Accordingly, we need not turn to any extrinsic sources on this point.[5] As a result, we follow

_____

[5] In arguing that he was prejudiced by the allegedly erroneous jury instruction, Olive relies on two questions from the jury. First, the jury asked the court "what are the guidelines for

12

theplain meaning of the statute without resorting to its legislative history.  (*N.S. v. D.M.* (2018) 21 Cal.App.5th 1040, 1047.)

Third, even if the Legislature believed that the *rationale* supporting the right of publicity was analogous to the rationale for copyright protection, it was still free to enact a law that deviated from its federal counterpart.  "Our role in construing a statute is simply to ascertain and to declare what is in terms or in substance contained in the statute, not to insert what has been omitted."  (*Esberg v. Union Oil Co.* (2002) 28 Cal.4th 262, 270, citing Code. Civ. Proc., § 1858.)[6]

---

determining profit damages and the amount[?]"  The court responded by circling the word "profits".  Second, the jury indicated it "has concerns about the profit that GNC made, and that we cannot figure out the formula for an amount even though we agree that GNC made money off of his image, could someone help us through the problem?"  In response, the court reopened closing argument, allowing each party to argue for an additional five minutes.  Having concluded there was no instructional error, we need not address Olive's argument regarding prejudice.  (E.g., *Center for Biological Diversity v. County of San Bernardino* (2016) 247 Cal.App.4th 326, 332.)

[6] Olive also repeatedly cites *Christoff v. Nestle USA, Inc.* (2007) 152 Cal.App.4th 1439 for this proposition, even after acknowledging that it was superseded by the Supreme Court's grant of review and subsequent reversal on other grounds in *Christoff v. Nestle USA, Inc.* (2009) 47 Cal.4th 468.  California Rules of Court, rule 8.1115 prohibits the citation of unpublished California state opinions, with certain limited exceptions inapplicable here.  (Cal. Rules of Court, rule 8.1115(a); *People v. Gray* (2014) 229 Cal.App.4th 285, 292, fn. 15 [improper to cite or rely upon an unpublished opinion].)

Finally, Olive contends that CACI No. 1821 did not give the jury adequate guidance as to the meaning of the term "attributable to" when determining the amount of gross revenues derived from GNC's use of Olive's likeness. The term "attributable" means "capable of being attributed." (Webster's Third New Internat. Dict. (1993) p. 141, col. 3.) When used as a verb, "attribute" simply means "explained as caused or brought about by; regard as occurring in consequence of or on account of . . . ." (*Id*., p. 142, col. 1.) In short, when something is attributable to an act, it is caused by or results from that act, a common definition that squares with the language of section 3344. We therefore see no error in that regard either.

## B.     Exclusion of Olive's Expert Witnesses

Olive contends the court erred in two respects when it excluded Anson and Lyons from testifying as experts at trial. First, the exclusion of these experts hinged on a misapplication of section 3344, requiring that he prove GNC's profits from the unauthorized use of his image. Having already concluded the trial court did not misinterpret the burden of proof set forth in section 3344, we will not revisit this claim. Second, Olive asserts the exclusion of Olive's proposed expert witnesses was an abuse of the court's discretion.

### 1. *Applicable Law and Standard of Review*

In the context of admitting expert testimony, our Supreme Court has explained that trial courts "have a substantial 'gatekeeping' responsibility." (*Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 769 (*Sargon*).) That is, "under Evidence Code sections 801,

subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or 3) speculative." (*Id*. at pp. 771–772; accord, *Cooper v. Takeda Pharmaceuticals America, Inc*. (2015) 239 Cal.App.4th 555, 577 (*Cooper*).)

"""[E]ven when the witness qualifies as an expert, he or she does not possess a carte blanche to express any opinion within the area of expertise. [Citation.] For example, an expert's opinion based on assumptions of fact without evidentiary support . . . or on speculative or conjectural factors . . . has no evidentiary value . . . and may be excluded from evidence. [Citations.]" [Citations.]'" (*Cooper, supra*, 239 Cal.App.4th at p. 577.) The court's gatekeeper function allows it to conclude there is simply too great an analytical gap between an expert's data and the opinion proffered, and thus exclude it as speculative or irrelevant. (*Sargon, supra*, 55 Cal.4th at p. 771; *David v. Hernandez* (2017) 13 Cal.App.5th 692, 698.)

However, "[t]he court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture." (*Sargon, supra*, 55 Cal.4th at p. 772.)

A ruling will be deemed an abuse of discretion only if it is "'so irrational or arbitrary that no reasonable person could agree with it.' [Citation.] But the court's discretion is not unlimited, especially when, as here, its exercise implicates a party's ability to present its case. Rather, it must be exercised within the

15

confines of the applicable legal principles." (*Sargon*, *supra*, 55 Cal.4th at p. 773.)

In *Sargon*, *supra*, 55 Cal.4th 747, a small dental implant company that had net profits of more than $100,000 in 1998 sued the University of Southern California for breach of contract after the university failed to present proper reports as its contract required. (*Id.* at p. 754.) The company sought damages for lost profits ranging from $200 million to more than $1 billion. (*Id.* at pp. 753, 755.) Following an evidentiary hearing, the trial court excluded as speculative the proffered testimony of an expert who would have opined that but for the university's breach of contract, the company would have become a worldwide leader in the dental implant industry. (*Id.* at p. 753.)

The Court of Appeal reversed, concluding that the trial court erred in excluding the expert's testimony, but the Supreme Court reversed the judgment of the Court of Appeal. (*Sargon*, *supra*, 55 Cal.4th at p. 753.) Our high court held that trial courts have the duty to act as a "gatekeeper" to exclude speculative expert testimony. (*Ibid.*) Although lost profits need not be proven with mathematical precision, they must also not be unduly speculative; thus, the trial court acted within its discretion when it excluded the expert's opinion that the company would have become extraordinarily successful had the university completed the clinical testing. (*Ibid.*) The expert's opinion was unreliable because he did not base his lost profit estimates on a market share ever achieved by the company. (*Id.* at p. 776.)

### 2. *Proceedings Below*

Olive intended to offer Anson as an expert to opine about his actual damages and the apportionment of GNC's profits

16

attributable to its unauthorized use of his likeness. Olive designated Lyons as an expert regarding (1) the calculation of GNC's revenues, expenses and profits, (2) to conduct an apportionment analysis, and (3) to testify about the indicia of fraud or intentional misconduct by GNC.

GNC moved for an order in limine to preclude Anson from testifying, arguing his opinions were speculative, and lacked foundation and an objective methodology. GNC moved to exclude Lyons' testimony on the ground that it relied on Anson's flawed and speculative analysis, and that his opinion relating to GNC's indicia of fraud or intentional misconduct invaded the province of the jury.

The court determined that both Anson and Lyons utilized a "nearly data free and methodologically primitive" analysis. The court said that their methodologies contained no science or data, and instead simply relied on mere wishful thinking. The court granted the motions to exclude both witnesses.

Olive requested reconsideration of the motion in limine rulings. The court denied the motion. Olive then filed a petition for writ of mandate challenging the trial court's ruling. This court summarily denied the petition.

### 3. *Anson's Testimony Was Properly Excluded*

GNC's revenue in 2012 was approximately $2.4 billion. Pertinent here, Anson opined that one to three percent of GNC's revenue was attributable to the unauthorized use of Olive's likeness.[7] Anson's opinion was based on (1) an analysis of

---

[7] Anson also concluded that Olive's actual damages for GNC's use of his likeness were between $500,000 and $1 million for 2012, and $1 million for 2013 based on (1) Olive's statement

17

purportedly comparable samples of comprehensive royalty agreements with various well-known celebrities, (2) the CEO's statement that in-store merchandising impacts the company's sales by zero to one percent, and (3) GNC's increase in revenue during the subject period of time. We agree with the trial court that his methodology was flawed in several aspects.

First, Anson based his opinion on a comparison of royalty agreements with various celebrities, athletes, and other persons of international prominence. These included Joe Namath, George Foreman, Kathy Ireland, Paris Hilton, Barry Bonds, Michael Jordan, Evander Holyfield, Tim Duncan, John Elway, Alex Rodriguez and Tyra Banks.[8] Intending no disrespect to Olive, nothing in the appellate record indicates that he shared anywhere near the same degree of celebrity as those included in Anson's sample.

In any event, Anson's methodology was also unsound because it compared the limited use of Olive's image from one photo shoot to comprehensive royalty agreements that included the licensors' name, signature, voice, initials, endorsement, and copyrights. Anson believed that GNC's sales increase was "driven by the face of the brand and a spokesperson [Olive] that's finally resonated with everyone." The fatal flaw in Anson's

_____

that he would not have accepted any less compensation, (2) Ferrari's testimony that Olive's minimum acceptable fee would have been in the "high six figures," and (3) the earnings of top male models published in a Forbes magazine article. Olive does not challenge the exclusion of Anson on this basis.

[8] The median compensation for an endorsement was five percent, but Anson believed one to three percent would be a more conservative figure as applied to Olive.

18

analysis is that, unlike the licensors in his sample, Olive was *not* the company spokesperson, and the use of images taken from a photo shoot with 15 other models is in no way analogous to a comprehensive celebrity endorsement arrangement. An expert may not base his or her opinion upon a comparison of matters that are not reasonably comparable. (See *Sargon, supra*, 55 Cal.4th at pp. 770; see also *Roscoe Moss Co. v. Jenkins* (1942) 55 Cal.App.2d 369.)

Second, Anson's analysis mischaracterized a statement from GNC's President and CEO, Joe Fortunato. In his deposition, Fortunato was asked what percentage in-store marketing contributes to company sales. He answered "it has the least amount of value of anything I've told you in regards to whether a consumer buys a product." When asked to give a percentage, Fortunato responded: "I can put it at anywhere from zero to slightly more than zero. Very little. [¶] . . . [¶] I'll go zero to one."

Anson cited this testimony to support his conclusion that at least one percent of GNC's revenues came from its unauthorized use of Olive's image. Olive asserts in his opening brief that "Fortunato admitted that the Live Well marketing campaign drove 1 percent of GNC's revenue." Fortunato's testimony did not apportion between the Live Well campaign and any other forms of in-store marketing. Neither did he attribute any portion of his estimate to Olive alone, as opposed to the other models used in that campaign. In short, he made no such admission. Anson's reliance on Fortunato's out-of-context statement further diminished the reliability of his analysis.

Third, Anson found a causal connection between GNC's annual growth rate and its unauthorized use of Olive's image

19

without identifying any reliable evidence linking the two, such as data from a focus group. Anson's analysis did not consider the macroeconomic conditions during the relevant period of time, GNC's pricing promotions, general sales in the vitamin and supplement industry, employee sales promotions, GNC's other marketing efforts, and the impact of professional athletic "ambassadors" used by GNC. Anson's conclusory analysis was therefore unduly speculative.

In sum, Anson's opinion hinged on hypothetical conjecture about GNC's profits attributable to Olive's image and would not have reasonably assisted the jury in evaluating the issue. (*Sargon*, *supra*, 55 Cal.4th at pp. 770, 777.) We agree with the trial court's conclusion that there was simply too great an analytical gap between the supposed data relied on by Anson and the opinion proffered. (See *id*. at p. 771 [court may conclude there is too great an analytical gap between the data and the opinion proffered]; see also *David v. Hernandez*, *supra*, 13 Cal.App.5th at p. 698 [same].) Thus, the court acted well within its gatekeeper's discretion by excluding Anson from testifying as an expert.

### 4. *Lyons Was Properly Excluded*

Lyons offered his opinion to quantify Olive's damages, and to prove that GNC intentionally continued using Olive's image after the release agreement expired. His calculation of Olive's actual damages directly hinged on Anson's determination that one to three percent of GNC's 2012 sales was attributable to the unauthorized use of Olive's likeness. Lyons admitted he did not conduct his own calculations "because they [Olive's counsel] retained an expert that had a long track record and is well-known

20

in branding and licensing and valuation of intellectual property rights.  [¶] And I met with him and reviewed the work that he did, so I would feel comfortable with it."

GNC moved to exclude Lyons, arguing that his calculations hinged on Anson's invalid approach and that his assessment about indicia of fraud on the part of GNC was not the proper subject of expert testimony.  The court granted the motion.  It found that Lyons' opinion regarding Olive's damages was directly tethered to Anson's calculations and was likewise inadmissible.  Further, the issue of whether GNC intentionally used Olive's image without authorization was beyond the scope of expert testimony.

Olive contends "[t]he trial court's lack of an independent review of Lyons' testimony again reveals that it did not conduct a causal nexus test.[9]  Because the trial court did not analyze the experts' testimony in this fashion, and relied on a misinterpretation of section 3344, its rulings should be reversed."[10]  We disagree.

---

[9] Olive repeatedly asserts that a claim under section 3344 requires a "causal nexus" between the defendant's unauthorized use of the plaintiff's image and the defendant's gross revenue.  The statute does not use this phrase and, as discussed *ante*, the federal authority relied upon by Olive to support this contention is inapplicable to this case.

[10] Olive generally challenges the exclusion of Lyons but he does not specifically address Lyons' proffered expertise as to whether GNC's unauthorized use of Olive's likeness was intentional or malicious.  It is his burden to assign a distinct claim of error.  (*Salas v. Department of Transportation* (2011) 198

In his deposition, Lyons testified Anson was exclusively tasked with calculating the portion of GNC's revenues attributable to the unauthorized use of Olive's likeness. Lyons was unaware how Anson selected the comparable sample, and he did not independently evaluate whether the sample was appropriate. In particular, Lyons did not ask Anson how he ruled out other persons in his sample, nor did he ask about the parameters for his sample database. Notwithstanding these gaps in information, Lyons was "very comfortable" with the manner in which Anson conducted his analysis.

Anson planned to provide Lyons an attribution percentage for him to perform a damages calculation. Lyons's evidence that GNC's unauthorized use of Olive's likeness increased its sales was "that their sales went up significantly more, as a percentage, than they did in the prior year, . . ." Lyons offered no compelling evidence supporting his conclusion that Olive's likeness directly caused an increase in GNC's sales.

Expert opinion testimony may be based upon information furnished to the expert by others so long as the information is of a type reasonably relied upon by professionals in the relevant field. (*Korsak v. Atlas Hotels, Inc.* (1992) 2 Cal.App.4th 1516, 1524; *Pacific Gas & Electric Co. v. Zuckerman* (1987) 189 Cal.App.3d 1113, 1135.) However, when the expert's opinion is not based on his own perception or knowledge, but depends instead upon information furnished by others, it is of little value unless the source is reliable. (See *Korsak*, at p. 1524, citing 1 Witkin, Cal. Evid. (3d ed. 1986) § 477, p. 448.) Thus, expert opinion testimony may not be based upon information furnished

Cal.App.4th 1058, 1074.) We therefore deem the issue forfeited. (*Ibid*.)

22

by others that is speculative, conjectural or otherwise unreliable. (*Ibid*; *Lockheed Litigation Cases* (2004) 115 Cal.App.4th 558, 564.)

As discussed, Lyons's opinion hinged on Anson's speculative assumptions with no independent evidentiary value. His opinions were unreliable on this basis. (See *Cooper*, *supra*, 239 Cal.App.4th at p. 577 [expert opinion based on speculative factors has no evidentiary value and may be excluded]; see also *Korsak v. Atlas Hotels, Inc.*, *supra*, 2 Cal.App.4th at pp. 1524, 1527 [excluding expert opinion where basis of opinion is unreliable hearsay].) The court properly excluded Lyons' sspeculative opinions. (See *Sargon*, *supra*, 55 Cal.4th at p. 772 ["goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion"]).[11]

### C. Prevailing Party Attorney Fees and Costs

Olive contends the trial court abused its discretion by denying his motion for prevailing party attorney fees. GNC contends that given the mixed results at trial, the court correctly concluded there was no prevailing party, or that, alternatively, this court should deem GNC to be the prevailing party. Although we originally agreed with Olive and ordered that the matter be remanded to conduct a hearing to determine an appropriate costs and attorney fees award, we subsequently granted GNC's petition

---

[11] Olive again cites the two jury questions about how to apportion GNC's ill-gotten profit in support of his contention that the court's exclusion of Anson and Lyons was prejudicial. Having found no error, we need not address this issue. (*Ante*, fn. 5.)

23

for rehearing on this issue.  After reviewing the matter once more, we are now persuaded that the trial court was correct.

### 1.  Proceedings Below

Olive's complaint alleged misappropriation of his likeness and sought restitution for GNC's unjust enrichment.  GNC initially denied Olive's allegations, but eventually admitted liability for the unauthorized use of his likeness.  Therefore, the only issue to be resolved at trial was Olive's damages, if any.

In his trial brief, Olive sought damages as follows:  actual damages of $1.5 million for the licensing fee to use his likeness in 2012-2013; past and future emotional distress damages of $2 million; restitution for GNC's profits based on the unlicensed use of his likeness in a range that went from approximately $54 million to as high as $175.9 million; and punitive damages of at least five times the amount of the jury's damage award.  During argument, Olive asked the jury to award restitution in amounts ranging from $11.7 to $35.2 million.  GNC impliedly recommended that Olive was entitled to a licensing fee of only $4,800, but urged the jury to award nothing in the way of emotional distress, restitution, or punitive damages.  The jury awarded Olive $213,000 for the licensing fee and $910,000 for his emotional distress, but did not award Olive either restitutionary or punitive damages.

Both parties sought prevailing party attorney' fees pursuant to section 3344.  The trial court concluded that neither party prevailed because "the jury accepted neither party's recommendation but instead awarded a middling sum amounting to a tie."  In reaching this decision the court noted that both parties were visibly dismayed by the jury verdict—Olive thought

24

it was too low and GNC thought it was too high.  The court emphasized counsel's facial reactions, stating "[t]his . . . mutually transparent display was unprecedented in the court's experience."

The court continued:  "Draw a line between two endpoints.  The left endpoint is GNC's jury recommendation: $4800.  The right endpoint is Olive's recommendation:  $23.5 million.  (His total recommendation actually was higher, but we simplify for clarity.)  Now mark million-dollar intervals on this line, from left to right.  This line charts the range of the quantitative dispute.  Finally, place a fulcrum under this line at the $1.1 million point.  That was the jury verdict.  If this line were a tangible yardstick and the verdict an actual fulcrum, the yardstick would tilt sharply in GNC's favor.  [¶] Think of a teeter totter.  Olive is in one seat, GNC is in the other.  The pivot point is the jury verdict.  The seesaw's pivot is far closer to GNC than to Olive.  [¶] According to the goal Olive set for himself, one cannot say Olive prevailed.  He lost, which is why he and his team thought he lost.  [¶] . . . [¶] GNC also thought it lost, and for good reason.  In addition to an actual damage award that vastly exceeded GNC's assessment, the jury awarded Olive $910,000 in emotional distress damages.  The GNC lawyers were plainly shocked by this pain and suffering sum."

The trial court therefore concluded that, given the "practical realities" of the case, the trial ended in a draw and there was no prevailing party.

25

*2. Applicable Law*

Generally speaking, parties to litigation must bear their own costs, including attorney fees.  (*Westamerica Bank v. MBG Industries, Inc.* (2007) 158 Cal.App.4th 109, 125–126.)  However, section 3344 mandates an award of attorney fees for "[t]he prevailing party in any action under this section."  (§ 3344, subd. (a); *Kirby v. Sega of America, Inc.* (2006) 144 Cal.App.4th 47, 62.)  The statute does not define the phrase "prevailing party."

"'In the absence of legislative direction in the attorney fees statute, the courts have concluded that a rigid definition of prevailing party should not be used.  [Citation.]  Rather, prevailing party status should be determined by the trial court based on an evaluation of whether a party prevailed "'on a practical level,'" and the trial court's decision should be affirmed on appeal absent an abuse of discretion.'  [Citation.]  'Among the factors the trial court must consider in determining whether a party prevailed is the extent to which each party has realized its litigation objectives.  [Citations.]' [Citation.]"  (*Sharif v. Mehusa Inc.* (2015) 241 Cal.App.4th 185, 192 (*Sharif*) [when there are two fee shifting statutes in separate causes of action, there can be different prevailing parties].)  That standard applies to actions under section 3344 (*Gilbert v. National Enquirer, Inc.* (1997) 55 Cal.App.4th 1273, 1277–1278), and it is the standard the trial court applied.

Most cases applying this standard to statutory attorney fee provisions have done so in the context of voluntary dismissals.  (*Donner Management Co. v. Schaffer* (2006) 142 Cal.App.4th 1296, 1310–1311 (*Donner Management*) [shareholder derivative suit against corporate officer dismissed without prejudice; trial court properly found defendant was prevailing party under

26

statutory fee provision because plaintiff's dismissal was compelled by corporate decision that maintaining action was not in corporation's best interests]; *Castro v. Superior Court* (2004) 116 Cal.App.4th 1010, 1022–1024 (*Castro*) [where lis pendens is voluntarily removed pending hearing on motion to expunge, the party who brought the motion may be entitled to recover statutory attorney fees based on practical considerations that motivated removal of the lien, including the merits of the expungement motion]; *Galan v. Wolfriver Holding Corp.* (2000) 80 Cal.App.4th 1124, 1129–1130 [plaintiffs brought action against landlord for substandard housing and parties settled; no abuse of discretion by trial court in determining there was no prevailing party where the settlement did not exonerate the landlord and plaintiffs implicitly determined it was not worth pursuing the matter]; *Gilbert, supra,* 55 Cal.App.4th 1273, 1277–1278 [actress voluntarily dismissed section 3344 action without prejudice; trial court did not abuse its discretion by finding no prevailing party because so little discovery had been conducted it was impossible to determine which party prevailed at a practical level].)

   *3.* Hsu v. Abbara

   We have not found, and the parties have not cited, a published decision applying the "practical level" test to a statutory cause of action where the term "prevailing party" is not defined and a plaintiff recovered some amount of damages at trial. Both parties suggest that guidance can be found in the somewhat analogous context of contractual attorney fee awards under Civil Code section 1717, which allows a trial court to

27

determine that neither party has prevailed on a contract cause of action.  (Civ. Code, § 1717, subd. (b)(2).)

The seminal decision in this area is *Hsu v. Abbara* (1995) 9 Cal.4th 863 (*Hsu*).  In *Hsu*, the would-be buyers of a house sued the sellers for breach of contract, claiming that the sellers reneged after an exchange of offers and counteroffers had resulted in an agreement to sell.  The trial court found for the defendant sellers after determining that the buyers' new offer, made after their purported acceptance, extinguished the previously accepted counteroffer.  The trial court, without explanation, declined to award the sellers their attorney fees pursuant to a contractual fee provision, and the Court of Appeal affirmed.

The *Hsu* court reversed, holding that the sellers were the prevailing parties as a matter of law because they achieved an unqualified win.  (*Hsu, supra,* 9 Cal.4th at pp. 876–877.)  Before reaching that conclusion, however, the *Hsu* court considered the possibility that the trial court might have properly found that neither party had prevailed, and established ground rules for making such a determination.

Citing earlier Court of Appeal decisions, *Hsu* noted "that the results of litigation may be so equivocal as to permit or even require that no party be found to have prevailed for purposes of attorney fees under [Civil Code] section 1717."  (*Hsu, supra,* 9 Cal.4th at p. 874.)

"As one Court of Appeal has explained, '[t]ypically, a determination of no prevailing party results when both parties seek relief, but neither prevails, or when the ostensibly prevailing party receives only a part of the relief sought.'  [Citation.]  By contrast, when the results of the litigation on the contract claim

28

are *not* mixed—that is when the decision on the litigated contract claims is purely good news for one party and bad news for the other—the Courts of Appeal have recognized that a trial court has no discretion to deny attorney fees to the successful litigant. Thus, when a defendant defeats recovery by the plaintiff on the only contract claim in the action, the defendant is the party prevailing on the contract under [Civil Code] section 1717 as a matter of law. [Citations.] Similarly, a plaintiff who obtains all relief requested on the only contract claim in the action must be regarded as the party prevailing on the contract for purposes of attorney fees under [Civil Code] section 1717." (*Hsu, supra*, 9 Cal.4th at pp. 875–876.)

As a result, "parties whose litigation success is not fairly disputable [may] claim attorney fees as a matter of right, while reserving for the trial court a measure of discretion to find no prevailing party when the results of the litigation are mixed. [¶] Accordingly, we hold that in deciding whether there is a 'party prevailing on the contract,' the trial court is to compare the relief awarded on the contract claim or claims with the parties' demands on those same claims and their litigation objectives as disclosed by the pleadings, trial briefs, opening statements, and similar sources. The prevailing party determination is to be made only by 'a comparison of the extent to which each party ha[s] succeeded and failed to succeed in its contentions.' [Citation.]" (*Hsu, supra,* 9 Cal.4th at p. 876.) Finally, when determining litigation success, the courts "should respect substance rather than form." (*Id*. at p. 877.)

29

*4. The* <u>Hsu</u> *Rule Applies Here*

To the extent we interpret the attorney fee provision contained in section 3344 apart from any factual issues, we exercise independent review. The trial court's factual determination concerning prevailing party status in accord with that provision is reviewed for abuse of discretion. (*Sharif, supra,* 241 Cal.App.4th at p. 191.)

*Hsu's* test for determining whether neither party prevailed at trial came in the context of Civil Code section 1717, which expressly allows for such a determination in contract-based claims. Section 3344, however, contains no such provision. Therefore, before determining whether *Hsu* applies here, we must first determine whether the trial court was free to find in the first instance that there was no prevailing party.

As noted earlier, because section 3344 does not define "prevailing party," the evaluation of whether a party prevailed turns on whether the party prevailed on a practical level. This requires the trial court to consider, among other things, the extent to which each party realized its litigation objectives. (*Sharif, supra,* 241 Cal.App.4th at p. 192.)

As part of this determination, we believe it is possible for a trial court to conclude that neither party prevailed because neither party realized its litigation objectives. This was explicit in *Galan, supra,* 80 Cal.App.4th at page 1128, which held in connection with a statutory fee provision that did not define "prevailing party" that it was within the trial court's discretion to determine "which party, *if either*, prevailed . . . ." (Italics added.) It was also a necessary, if unanalyzed, corollary to the holding in *Gilbert, supra,* 55 Cal.App.4th at pages 1277–1278, that the defendant in a section 3344 action in whose favor a dismissal was

30

entered was not entitled to recover its attorney fees because it was not possible to determine "whether either side had prevailed on a practical level."

We conclude that *Hsu* provides a workable approach for determining whether neither party prevailed. As *Sharif* noted, the test in statutory fee provisions that do not define "prevailing party" is to determine whether a party prevailed on a practical level by considering, among other things, the extent to which each party realized its litigation objectives. (*Sharif, supra,* 241 Cal.App.4th at p. 192.) The *Hsu* test is substantially similar, coming into play in so-called "mixed result" cases, where the ostensibly prevailing party receives only part of the relief sought. (*Hsu, supra,* 9 Cal.4th at p. 875.) In such cases, the trial court compares the relief awarded with the parties' demands, as disclosed by the pleadings, trial briefs, opening statements, and other sources. Based on that, the trial court determines whether there has been a prevailing party by comparing the extent to which each party succeeded or failed in its contentions. (*Id.* at p. 876.)

5. *The Trial Court Did Not Err By Finding That There Was No Prevailing Party*

It is undisputed that neither party obtained an unqualified win. Olive initially sought $1.5 million in actual damages, $2 million for his emotional distress, restitution of GNC's profits in a range that exceeded $100 million, and five times the total of those sums as punitive damages. Instead, he obtained $213,000 in actual damages, $910,000 for his emotional distress, and nothing in terms of restitution or punitive damages. GNC

31

contended that Olive was entitled to nothing more than $4,800 in actual damages, but ended up with an adverse verdict of more than $1.1 million. Accordingly, the trial court was free to view this as a mixed result and then exercise its discretion to determine whether one party prevailed, or whether neither party prevailed because neither achieved its practical litigation objectives.

A court abuses its discretion if its ruling is so irrational or arbitrary that no reasonable person could agree with it. (*Property California SCJLW One Corp. v. Leamy* (2018) 25 Cal.App.5th 1155, 1162.) An abuse of discretion occurs if, in light of the applicable law and the relevant circumstances, the court's decision exceeds the bounds of reason, resulting in a miscarriage of justice. (*Espejo v. The Copley Press, Inc.* (2017) 13 Cal.App.5th 329, 378.) The trial court here engaged in a detailed analysis of each party's results, taking into account the reduced amount of restitution damages sought by Olive in light of the trial court's evidentiary rulings excluding his expert witnesses on that topic.[12] Even though the jury awarded Olive more than $1.1 million, the trial court concluded that the verdict still represented a loss for Olive based on his own trial objectives. We do not believe this was an abuse of discretion.

The court in *Marina Pacifica Homeowners Assn. v. Southern California Financial Corp.* (2018) 20 Cal.App.5th 191

---

[12] Olive disputes that he ever sought restitution damages of more than $175 million, claiming that the figure represented nothing more than the high range of GNC's possible profits from its unauthorized use of his likeness. As just noted, however, the trial court relied on a far lower amount when determining each party's litigation success, as do we.

(*Marina Pacifica*) considered an analogous mixed-results scenario. We find its reasoning instructive.

The plaintiff in *Marina Pacifica* was a condominium homeowners association and the defendant was the assignee of the project developer. The dispute centered on the assignee's right to collect certain ongoing payments as an assignment fee pursuant to each unit owner's purchase agreement. Following years-long litigation, the developer's assignee was awarded $39 million. However, the trial court determined that neither party had prevailed because the assignee had sought damages of $97 million. The *Marina Pacifica* court affirmed, holding that under the principles of *Hsu, supra,* 9 Cal.4th 863, the results were sufficiently mixed to justify the trial court's findings. (*Marina Pacifica, supra,* 20 Cal.App.5th at p. 207.)

In short, a multi-million dollar award somewhat more than 40 percent of the amount sought was sufficiently "mixed" that the trial court could reasonably conclude neither party had prevailed. The facts here are even more compelling, where, when Olive's punitive damage request is factored in, he recovered less than one percent of his litigation objectives.[13]

Olive relies primarily on three decisions to support his contention that the trial court abused its discretion when it failed to recognize that he was the prevailing party: *de la Cuesta v.*

_____

[13] We base this on the $1.1 million Olive was awarded, plus the mid-point $20 million in restitution damages he eventually sought at trial, added to the multiplier of five he requested for punitive damages. At Olive's bottom-range restitution demand of approximately $11 million, the verdict is still less than two percent of what he sought at trial. And even if we factored out his punitive damages request, the verdict is still only five percent of the verdict plus his mid-point restitution demand.

33

*Benham* (2011) 193 Cal.App.4th 1287 (*de la Cuesta*); *Silver Creek, LLC v. Blackrock Realty Advisors* (2009) 173 Cal.App.4th 1533 (*Silver Creek*); and *Ajaxo v. E\*Trade Group, Inc.* (2005) 135 Cal.App.4th 21 (*Ajaxo*).[14]  None is applicable.

The *de la Cuesta* court held that even in a mixed results case it might be an abuse of discretion to determine there was no prevailing party if the results were lopsided in one party's favor. (*de la Cuesta, supra,* 193 Cal.App.4th at p. 1295.)  The plaintiff in that unlawful detainer action was a landlord who sought $103,000 in back rent, while the tenant claimed she owed nothing.  The tenant vacated the premises the day before trial and the plaintiff was awarded $70,000.  The trial court found there was no prevailing party, but the Court of Appeal reversed, holding that the trial court had abused its discretion because the results were so lopsided in the plaintiff's favor.  (*Id.* at pp. 1290, 1296.)  By contrast, given the disparity between what Olive sought and what he achieved at trial, we cannot state that the results here were lopsided in his favor.

The same is true of *Silver Creek, supra* 173 Cal.App.4th 1533 at pages 1540–1541, where the plaintiff-seller of real property obtained a judgment declaring that it had properly terminated the sales agreement for property worth more than $29 million, while the defendant obtained the return of its $1.13 million deposit.  The trial court's determination that neither party prevailed was an abuse of discretion because the property issue was most important to the parties, meaning the plaintiff clearly obtained the greater relief.  (See *Marina Pacifica, supra,* 20 Cal.App.5th at pp. 206–207.)

---

[14] We relied on these as well in our original decision, but have reevaluated them in light of GNC's rehearing petition.

Finally, in *Ajaxo, supra,* 135 Cal.App.4th 21, 59, the Court of Appeal rejected defendant's contention that the plaintiff could not be the prevailing party on its breach of contract cause of action because the $1 million damage award was far less than what it had requested. Even though the award was less than the amount sought, the plaintiff was still the prevailing party because it received a simple, unqualified win on its breach of contract claim. (See *Marina Pacifica, supra,* 20 Cal.App.5th at p. 205.) As already discussed, Olive's "win" was not unqualified.

In short, given that the mixed results in this case did not amount to a lopsided verdict in Olive's favor, the trial court did not abuse its discretion in determining that neither party prevailed for purposes of awarding attorney fees under section 3344.[15]

---

[15] We reject Olive's contention that our holding undercuts section 3344 by requiring either a complete victory, or that the plaintiff in such an action must be awarded restitutionary damages in order to be deemed the prevailing party. Instead, we merely recognize that the trial court that presided over the matter is in the best position to determine the degree to which either party succeeded at trial, that each case must be evaluated individually, and that, under the relevant circumstances and the applicable law, the trial court here did not abuse its discretion in concluding that neither party had prevailed.

## DISPOSITION

The judgment and order denying both parties attorney fees are affirmed.  Each party shall bear its own appellate costs.

<u>CERTIFIED FOR PUBLICATION</u>


MICON, J.*

We concur:



MANELLA, P. J.                    WILLHITE, J.


*Judge of the Los Angeles County Superior Court assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.