Filed: 8/13/21 (unmodified opn. attached)

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROSALINDA ZUNIGA,<br><br>Plaintiff and Appellant,<br><br>v.<br><br>ALEXANDRIA CARE CENTER,<br>LLC et al.,<br><br>Defendants and Respondents. | B297023<br><br>(Los Angeles County<br>Super. Ct. No. BC529776)<br><br>ORDER MODIFYING OPINION<br>(NO CHANGE IN THE<br>APPELLATE JUDGMENT) |

THE COURT:

It is ordered that the opinion filed herein on August 12, 2021 be modified as follows:

On page 20, replace *Salazar v. See's Candy Shops, Inc.* (2021) 64 Cal.App.5th 85, 90 with *Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 65.

There is no change in the appellate judgment.

_____

PERLUSS, P. J.              SEGAL, J.              FEUER, J.

Filed 8/12/21 (unmodified version)
**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| ROSALINDA ZUNIGA, | B297023 |
| Plaintiff and Appellant, | (Los Angeles County Super. Ct. No. BC529776) |
| v. | |
| ALEXANDRIA CARE CENTER, LLC, et al., | |
| Defendants and Respondents. | |

APPEAL from a judgment of the Superior Court of Los Angeles County, Elihu M. Berle, Judge. Reversed and remanded.

Matern Law Group, Matthew J. Matern, Dalia Khalili and Andrew J. Sokolowski for Plaintiff and Appellant.

Littler Mendelson, Curtis A. Graham and James Payer for Defendants and Respondents Alexandria Care Center, Skilled Healthcare, LLC and Skilled Healthcare Group, Inc.

_____

Rosalinda Zuniga appeals the judgment in favor of Alexandria Care Center, LLC, Skilled Healthcare, LLC and Skilled Healthcare Group, Inc. (collectively Alexandria Care) entered after a five-day bench trial of her representative claim for penalties under the Labor Code Private Attorneys General Act of 2004 (PAGA) (Lab. Code, § 2698 et seq.).[1] Zuniga contends the trial court erred in excluding the testimony of her two proposed expert witnesses, Dean Van Dyke and Richard Drogin, Ph.D., and the spreadsheets prepared by Van Dyke's company, iBridge LLC, which provided the basis for Dr. Drogin's opinions establishing Alexandria Care's Labor Code violations. We agree the court erred in excluding the expert testimony of Dr. Drogin even if the iBridge spreadsheets lacked the foundation necessary to be admitted into evidence, and the error was prejudicial. The judgment is reversed, and the cause remanded for a new trial.

## FACTUAL AND PROCEDURAL BACKGROUND

1. *Zuniga's Complaint and Settlement of Her Individual Claims*

Zuniga, employed by Alexandria Care as a housekeeper from 2006 through 2012, filed a complaint on December 6, 2013 asserting claims on behalf of herself and a putative class of current and former nonexempt employees of Alexandria Care for violations of various provisions of the Labor Code and the governing Industrial Welfare Commission wage order, including failure to provide required meal periods, failure to provide required rest periods, failure to indemnify employees for necessary expenditures incurred in the discharge of their duties

---

[1]     Statutory references are to this code unless otherwise stated.

and failure to maintain required records. She also asserted a cause of action for unfair and unlawful business practices in violation of Business and Professions Code section 17200 on behalf of herself and the putative class and a representative action for civil penalties under PAGA. The PAGA claim identified six categories of violations: Failure to compensate employees for missed meal periods; failure to properly compensate for overtime; failure to pay the minimum wage; failure to maintain records for employees; failure to provide employees with accurate itemized wage statements; and failure to pay all wages due. Prior to filing her lawsuit, Zuniga gave notice to Alexandria Care and the Labor Workforce Development Agency (LWDA) of the alleged Labor Code and wage order violations at issue. The LWDA advised Zuniga it did not intend to investigate the allegations.

The trial court granted Alexandria Care's motion to compel arbitration of Zuniga's individual claims on May 20, 2014. The PAGA claim was stayed. On February 1, 2016 the parties settled Zuniga's individual claims. The PAGA claim was not part of the settlement. The court lifted its stay and ultimately scheduled a bench trial on the PAGA claim for November 26, 2018.

2. *Zuniga's Trial Plan, Expert Witnesses and Proposed Trial Exhibits 5, 6 and 7*

Zuniga intended to prove her PAGA claim through her own testimony; the testimony of Alexandria Care's corporate person-most-knowledgeable designee, Sherry Ann Alvarez, and its former administrator, Holly Ianieri; the expert opinion testimony of Dr. Drogin, who performed statistical analyses of Alexandria Care's timekeeping and payroll records; and the testimony of Van Dyke regarding the conversion of Alexandria Care's records,

3

produced in discovery in portable document format (PDF) and admitted into evidence as exhibits 2, 3 and 4, into computer-readable spreadsheets (Excel) by iBridge, which were marked as trial exhibits 5, 6 and 7.

a. *Van Dyke's video deposition*

At the final status conference on October 29, 2018, the trial court ordered Zuniga to serve her expert witness reports no later than November 9, 2018 and to produce her experts for deposition no later than November 16, 2018. Various problems arose in scheduling Van Dyke's deposition, including a delay caused by Zuniga's failure to timely produce all the converted spreadsheets created by iBridge upon which Dr. Drogin relied for his opinions. Van Dyke ultimately sat for a videotaped deposition on November 29, 2018, several days after trial began.[2] Because of a long-planned European vacation, Van Dyke was not available to testify in person when trial resumed the following week.

At his deposition Van Dyke, a vice president of iBridge "responsible for sales, business development, and the operational aspects of the projects to make sure that they're delivered from our teams in India," testified he had a "general management" role at iBridge and in creating the spreadsheets provided to Dr. Drogin for his analysis in this case. Elaborating, Van Dyke explained he assists in defining the scope of client projects, works with clients to ensure the iBridge team understands the project requirements and follows up with the client to confirm the project has been successfully delivered.

---

[2] The deposition transcript was admitted into evidence for the limited purpose of considering the admissibility of Van Dyke's deposition testimony at trial.

4

Van Dyke is neither a statistician nor a computer engineer. He did not participate in converting the documents Zuniga provided into electronic spreadsheets; he sent the material to India for conversion, together with the project guidelines prepared by counsel. Van Dyke did not communicate substantively with the data analysts who performed the data conversion and prepared the spreadsheets, did not validate the data conversion's accuracy and was not involved in the quality control process.

When questioned by Zuniga's counsel, Van Dyke, apparently referring to (or reading from) a document in front of him, described the process used by iBridge to convert data from PDF to electronic format. The company uses "double blind data entry, which consists of two data operators entering the same data." The two data sets are compared and cross-referenced to detect errors. Van Dyke testified the double-entry system yields a 99.9 percent accuracy rate. To verify accuracy iBridge reviews 60 percent of the data on a page-by-page basis, comparing the original material to its converted format; a further review compares an additional sample of 30 percent of the data. Van Dyke also testified that iBridge has obtained an ISO 9001 certification for data processing and document imaging services, based on independent audit teams confirming the quality control processes iBridge describes have actually been implemented.

b. *Dr. Drogin's expert testimony*

Dr. Drogin, a professor emeritus of statistics at California State University, Hayward, analyzed the timekeeping and payroll data contained in the iBridge spreadsheets as it related to Zuniga's claims that Alexandria Care failed to compensate employees for missed meal breaks and that Alexandria Care's

rounding policy resulted in underpayment of wages earned. Dr. Drogin was deposed on November 20, 2018 and initially testified in court on November 27, 2018, the second day of trial. Alexandria Care did not challenge Dr. Drogin's qualifications as an expert witness.

When initially retained in the case, Dr. Drogin advised Zuniga's counsel to have the timekeeping and payroll records produced by Alexandria Care in PDF-format entered into a computer so they could be analyzed. He subsequently performed his analysis using Excel spreadsheets prepared by iBridge, exhibits 5, 6 and 7.

Dr. Drogin testified his consulting firm had recommended using iBridge in a number of cases in which information had been obtained in paper-copy format and needed to be entered into a computer to produce computer-readable documents, such as Excel. He estimated he had relied upon iBridge-produced data in 10 to 15 cases and felt comfortable using its work product based on conversations he had in the past with iBridge personnel who supervised the data entry. According to Dr. Drogin, he "found that they use fairly reliable data quality control techniques to make sure the data is entered accurately." Asked specifically about double-blind data entry, Dr. Drogin testified it ensures an extremely high level of accuracy of the product, which he recommends should be used: "In my experience, the data is nearly perfect or there may be some random error here and there. Generally speaking, you get extremely accurate results." Asked if he often relies on data developed through that method in his work, Dr. Drogin replied, "Yes, I have in the past. I've done that. I believe they did that in this case."

On cross-examination Dr. Drogin acknowledged he needed the iBridge data compilation to conduct his analysis and confirmed he had not spoken to anyone at iBridge, including Van Dyke, with respect to the data provided to him for Zuniga's case. Defense counsel then asked, "You don't know if a double blind data entry was done with respect to the data in this case, do you?" Dr. Drogin replied, "I don't know that from talking to [Van Dyke], no." However, when asked by Alexandria Care's counsel, "Did you do anything to validate the PDF spreadsheet that was given to you?" Dr. Drogin responded, "I did some comparison of the PDF's to the spreadsheet that I was given. They appeared to be the same."

3. *The Court's Evidentiary Rulings*

During the first three days of trial, November 26, 27 and 28, 2018, the court heard testimony from Zuniga, Dr. Drogin, Alvarez and Ianieri. When trial resumed on December 3, 2018 Zuniga sought to introduce Van Dyke's videotaped deposition testimony; Alexandria Care objected. The court directed the parties to brief the testimony's admissibility by the following morning. In making its order, the court observed that, in addition to the procedural issues regarding the admissibility of Van Dyke's deposition testimony, it was concerned about its substance: "The question is whether there is sufficient foundation for Mr. Van Dyke's testimony because without the foundation for Mr. Van Dyke's testimony, then Mr. Drogin doesn't have foundation for his testimony."

On December 4, 2018, after hearing argument of counsel, the court ruled that Van Dyke was not qualified as an expert to testify about computer data processing: "He doesn't have the education or the background. He doesn't have the experience or

7

the training in data processing in the conversion of information from raw data to spreadsheets." The court excluded Van Dyke's testimony.

The court additionally ruled Van Dyke had not provided the necessary foundation for the iBridge spreadsheets and excluded exhibits 5, 6 and 7. The court noted, "He himself is not involved in the process. He did not supervise the process. He did not review the process. Did not direct the process. He did not verify the process or review the accuracy of the process."

At this point Zuniga sought to recall Dr. Drogin to testify concerning Dr. Drogin's independent verification of the accuracy of the iBridge data conversion spreadsheets, based on an analysis done on November 30, 2018, following Dr. Drogin's initial trial testimony and Alexandria Care's challenge to the foundation for exhibits 5, 6 and 7. The court permitted the testimony subject to Alexandria Care's objection and motion to strike.

Dr. Drogin explained he took a random sample of 50 pages from the raw data PDF-document production (exhibit 2), examined every line (1,000 total rows of data), compared the information to that in the iBridge spreadsheets and found no errors. He testified his sample generated a 99.7 percent confidence interval. In response to the court's question why Dr. Drogin had not verified that the data in the iBridge spreadsheets accurately reflected the raw data in the documents produced by Alexandria Care prior to his deposition, Dr. Drogin responded, "Because I was assuming that I would be able to rely on the accuracy of the company, iBridge, which entered the data. I've had, I've been, I've worked with them before . . . ." Dr. Drogin subsequently added that, because he knew iBridge was ISO certified, he understood it had actually used the double-

blind data entry procedure when creating the spreadsheets upon which he based his trial testimony.

After Dr. Drogin completed his additional testimony, the court granted Alexandria Care's motion to strike on the ground the opinions had not been disclosed during his deposition and the analysis was undertaken after his deposition and his trial testimony. Under the circumstances, the court stated, "it would be unjust, in violation of the rules of evidence and the rules of procedure to allow the testimony to stand."

Following the court's evidentiary rulings, Zuniga rested her case. Indicating it intended to file a motion for judgment pursuant to Code of Civil Procedure section 631.8, Alexandria Care also rested. Alexandria Care filed its motion, and the court set a further briefing and hearing schedule.

4. *The Trial Court's Order Granting Alexandria Care's Motion for Judgment; the Statement of Decision*

After further argument on January 30, 2019, the court granted Alexandria Care's motion for judgment. The court memorialized its reasoning in a statement of decision filed March 18, 2019.

The statement of decision summarized the court's rulings regarding Zuniga's expert witnesses, explaining it had found Van Dyke was not qualified as an expert to testify about computer data processing and had not provided the necessary foundation for the spreadsheets created by iBridge. In a footnote the court stated Zuniga's failure to adhere to the required procedures to have Van Dyke testify through his deposition rather than at trial constituted an additional ground for excluding the testimony and the spreadsheets. As for Dr. Drogin, "At trial, Dr. Drogin confirmed that his opinions were based

entirely on the spreadsheets created by iBridge. Accordingly, based on the exclusion of Mr. Van Dyke's testimony and the iBridge spreadsheets from evidence, the Court ruled that Dr. Drogin's testimony was without any foundation and would not be considered."

In light of the exclusion of Zuniga's experts and the iBridge spreadsheets, Zuniga's evidence of Labor Code violations consisted of her own testimony, the two fact witnesses she called during her case-in-chief and Alexandria Care's records. Based on that evidence and its assessment of the credibility of the witnesses, the court found that Zuniga had "failed to meet her burden to establish by a preponderance of the evidence that (1) she was an aggrieved employee and (2) she or any other employees suffered any of the below Labor Code violations."

The statement of decision briefly identified the elements of the alleged Labor Code violations and found, as to her meal break and rest break claims, Zuniga had not provided credible testimony concerning any instances during the PAGA period in which she or other employees were not provided or permitted to take compliant breaks. As to her claims regarding unpaid time based on Alexandria Care's rounding policy, the court ruled that using such a policy was not unlawful[3] and found the evidence

---

[3] Earlier this year the Supreme Court in *Donohue v. AMN Services, LLC* (2021) 11 Cal.5th 58, 61 held "employers cannot engage in the practice of rounding time punches—that is, adjusting the hours that an employee has actually worked to the nearest preset time increment—in the meal period context." Noting that state and federal courts have applied the neutrality test described in *See's Candy Shops, Inc. v. Superior Court* (2012) 210 Cal.App.4th 889 to determine whether various rounding policies are valid under California law—the approach used by the

confirmed Zuniga had been compensated for all hours worked during the PAGA period.  Additionally, Zuniga had provided no admissible evidence that she or other employees worked off the clock during the PAGA period or that Alexandria Care maintained an unlawful preapproved overtime policy that resulted in a failure to pay employees any wages they had earned.

Zuniga's claims regarding failure to maintain required employee records and to provide accurate itemized wage statements, the court concluded, were derivative of her meal period, rest period and unpaid overtime and minimum wage claims and, therefore, also lacked merit.  To the extent not derivative of her other claims, Zuniga had presented no credible evidence of any violation.  Finally, the court found Zuniga had failed to establish that Alexandria Care did not indemnify her or any other employees for any necessary expenditures incurred in the discharge of their duties.

Judgment was entered on March 18, 2019.  Zuniga filed a timely notice of appeal.

## DISCUSSION

1. *PAGA:  A Brief Overview*

As the Supreme Court explained last year in *Kim v. Reins International California, Inc.* (2020) 9 Cal.5th 73 (*Kim*), PAGA was enacted to facilitate broader enforcement of provisions of the Labor Code intended to protect the health, safety and compensation of workers.  (*Id.* at pp. 80-81.)  Under PAGA an

---

trial court in the case at bar—the Supreme Court observed, "This court has never decided the validity of the rounding standard articulated in *See's Candy I*, and we are not asked to do so here." (*Donohue*, at p. 72.)

11

employee may seek civil penalties for Labor Code violations committed against her and other aggrieved employees by bringing, on behalf of the state, a representative action against her employer. (*Id.* at p. 81; *ZB, N.A. v. Superior Court* (2019) 8 Cal.5th 175, 181.)

The *Kim* Court emphasized a PAGA claim "is legally and conceptually different from an employee's own suit for damages and statutory penalties. An employee suing under PAGA 'does so as the *proxy or agent of the state's labor law enforcement agencies*.' [Citation.] Every PAGA claim is 'a dispute between an employer and the *state*.' [Citations.] Moreover, the civil penalties a PAGA plaintiff may recover on the state's behalf are distinct from the statutory damages or penalties that may be available to employees suing for individual violations. [Citation.] Relief under PAGA is designed primarily to benefit the general public, not the party bringing the action. [Citations.] 'A PAGA representative action is therefore a type of qui tam action,' conforming to all 'traditional criteria, except that a portion of the penalty goes not only to the citizen bringing the suit but to all employees affected by the Labor Code violation.' [Citation.] The 'government entity on whose behalf the plaintiff files suit is always the real party in interest.'" (*Kim*, *supra*, 9 Cal.5th at p. 81.)

2. *Zuniga Had Standing To Assert a PAGA Claim as an "Aggrieved Employee"*

"Not every private citizen can serve as the state's representative. Only an *aggrieved employee* has PAGA standing. [Citations.] An 'aggrieved employee' is defined [in section 2699, subdivision (c),] as 'any person who was employed by the alleged

12

violator and against whom one or more of the alleged violations was committed.'" (*Kim, supra,* 9 Cal.5th at pp. 81-82.)

In addition to ruling that Zuniga had failed to carry her burden of proving she or other employees had suffered any Labor Code violations, the trial court appeared to find, as an alternate ground for granting judgment in favor of Alexandria Care, that Zuniga lacked standing to assert a PAGA claim as an aggrieved employee. Indeed, Alexandria Care in its respondent's brief argues any error in excluding expert evidence was harmless because Zuniga failed to establish her standing as an aggrieved employee under PAGA "in the first place."[4]

The Supreme Court's opinion in *Kim, supra,* 9 Cal.5th 73, decided a year after judgment was entered in the trial court, makes clear the trial court's ruling was based on an incorrect understanding of section 2699, subdivision (c)'s standing requirement and, in particular, whether the PAGA plaintiff need only allege she had suffered an applicable Labor Code violation or must prove she suffered actual injury as a result of the violation.

The plaintiff in *Kim* sued his employer in a putative class action, claiming he and other "training managers" had been misclassified as exempt employees. The operative complaint alleged causes of action for failure to pay wages and overtime, failure to provide meal and rest breaks, failure to provide accurate wage statement, waiting time penalties and unfair competition. It also sought civil penalties under PAGA. (*Kim,*

---

[4] Alexandria Care's suggestion at oral argument that the issue of standing is not properly before us because not raised in Zuniga's opening brief, is, of course, belied by this contention that Zuniga's purported lack of standing renders harmless any errors made by the trial court.

13

*supra*, 9 Cal.5th at p. 82.) Kim's individual claims were ordered to arbitration; his class claims were dismissed; and the PAGA cause of action was stayed. (*Ibid.*)

Kim settled his individual claims, and the stay of the PAGA cause of action was lifted. The employer's motion for summary adjudication on the ground Kim lacked standing was granted, and the judgment was affirmed on appeal. The Supreme Court reversed, holding, "The plain language of section 2699(c) has only two requirements for PAGA standing. The plaintiff must be an aggrieved employee, that is, someone 'who was employed by the alleged violator' and 'against whom one or more of the alleged violations was committed.' (§ 2699(c).) Both requirements derive from readily ascertainable facts, and both are satisfied here. Kim was employed by Reins and alleged that he personally suffered at least one Labor Code violation on which the PAGA claim is based. Kim is thus an 'aggrieved employee' with standing to pursue penalties on the state's behalf." (*Kim*, *supra*, 9 Cal.5th at pp. 83-84.)

As the *Kim* Court explained, "The Legislature defined PAGA standing in terms of violations, not injury. Kim became an aggrieved employee, and had PAGA standing, when one or more Labor Code violations were committed against him. [Citation.] Settlement did not nullify these violations. The *remedy* for a Labor Code violation, through settlement or other means, is distinct from the *fact* of the violation itself. . . . [¶] Further, Reins's assertion that a PAGA plaintiff is no longer 'aggrieved' once individual claims are resolved is at odds with the Legislature's explicit definition. Section 2699(c) defines an 'aggrieved employee' as 'any person who was employed by the alleged violator and against whom one or more of the alleged

14

violations was committed.' It does not require the employee to claim that *any* economic injury resulted from the alleged violations. . . . Reins's use of 'aggrieved' as synonymous with having an unredressed injury is at odds with the statutory definition. [¶] Reins's interpretation would add an expiration element to the statutory definition of standing. It would expand section 2699(c) to provide that an employee who accepts a settlement for individual damage claims is no longer aggrieved. Of course, the Legislature said no such thing." (*Kim*, *supra*, 9 Cal.5th at pp. 84-85; see *Johnson v. Maxim Healthcare Services, Inc.* (July 21, 2021, D077599) __ Cal.App.5th __ , __ [2021 Cal.App. Lexis 594 [p. 8] ["[t]he fact that Johnson's individual claim may be time-barred does not nullify the alleged Labor Code violations nor strip Johnson of her standing to pursue PAGA remedies"].)

Zuniga's status was identical to Kim's. She was employed by Alexandria Care and alleged she had personally suffered at least one Labor Code violation on which the PAGA claim was based. Her individual clams were settled after arbitration had been ordered. Whether or not she had any unredressed injuries following that settlement, she, like Kim, was an "aggrieved employee" with standing to pursue penalties on the state's behalf.

### 3. *The Trial Court Did Not Abuse Its Discretion in Excluding the iBridge Spreadsheets*

Although the trial court refused to permit Zuniga to introduce Van Dyke's deposition testimony at trial, it separately determined his testimony failed to provide the necessary foundation for the spreadsheets created by iBridge and used by Dr. Drogin for his analysis of Zuniga's PAGA claim. The court's exclusion of the iBridge spreadsheets did not constitute an abuse

15

of discretion.  (See *People v. Nieves* (2021) 11 Cal.5th 404, 445 ["'[w]e review a trial court's decision to admit or exclude evidence "for abuse of discretion"'"]; *People v. Thompson* (2016) 1 Cal.5th 1043, 1120 [as a general matter appellate courts "apply 'the abuse of discretion standard of review to any ruling by a trial court on the admissibility of evidence'"].)[5]

The iBridge spreadsheets are writings within the meaning of Evidence Code section 250.  As such, for them to be admissible, Zuniga needed to introduce evidence sufficient to sustain a finding that they, in fact, accurately reflected the conversion into a computer-readable form of the PDF timekeeping and payroll records provided by Alexandria Care.  (Evid. Code, §§ 1400 ["[a]uthentication of a writing means (a) the introduction of evidence sufficient to sustain a finding that it is the writing that the proponent of the evidence claims it is or (b) the establishment of such facts by any other means provided by law"], 1401, subd. (a) ["[a]uthentication of a writing is required before it may be received in evidence"]; see *People v. Goldsmith* (2014) 59 Cal.4th 258, 266 ["[t]o be admissible in evidence, a writing must be relevant and authenticated"].)  "Authentication is to be determined by the trial court as a preliminary fact."  (*Goldsmith*, at p. 266; see also *id.* at p. 267 ["The purpose of the evidence will determine what must be shown for authentication, which may

---

[5]    The sole purpose of Van Dyke's deposition testimony was to provide the foundation for the iBridge spreadsheets.  Because the trial court properly excluded the spreadsheets after considering Van Dyke's testimony, we need not address its rulings that Van Dyke was not qualified to testify as a data processing expert or that Zuniga had not complied with the required procedures for introduction of his deposition testimony at trial.

vary from case to case.  [Citation.]  The foundation requires that there be sufficient evidence for a trier of fact to find that the writing is what it purports to be, i.e., that it is genuine for the purpose offered"].)

Although the trial court might well have exercised its discretion differently, its decision to exclude the iBridge spreadsheets because Zuniga failed to provide foundational testimony necessary to authenticate them was far from arbitrary, capricious or patently absurd.  (See *People v. Goldsmith*, *supra*, 59 Cal.4th at p. 266 [a trial court's exercise of discretion in admitting or excluding evidence will not be disturbed "'except on a showing the trial court exercised its discretion in an arbitrary, capricious, or patently absurd manner that resulted in a manifest miscarriage of justice'"]; see also *People v. Nieves*, *supra*, 11 Cal.5th at p. 445; *People v. Rodriguez* (1999) 20 Cal.4th 1, 9-10.)  Van Dyke had no hands-on or supervisory involvement in the conversion of the Alexandria Care PDF documents into Excel spreadsheets, had no substantive conversations with the team that prepared the spreadsheets and did not review the finished product, let alone validate the results.  He testified only as to the general quality control procedures used at iBridge to ensure the accuracy of the conversion process.  He had no personal knowledge that those procedures were actually used on Zuniga's project and did not offer an opinion, expert or otherwise, that exhibits 5, 6 and 7 accurately reflected in computer-readable format the Alexandria Care timekeeping and payroll records.

The authentication (foundation) necessary to admit exhibits 5, 6 and 7 could have been provided by Dr. Drogin's new analysis verifying the accuracy of the spreadsheets, but the trial court reasonably exercised its discretion to strike Dr. Drogin's

additional testimony concerning that work, which was not undertaken until after he had completed his trial testimony. (See Evid. Code, § 778 ["After a witness has been excused from giving further testimony in the action, he cannot be recalled without leave of the court. Leave may be granted or withheld in the court's discretion"].)

Although Dr. Drogin stated at the conclusion of his deposition that he might do additional work, whether or not asked by Zuniga's counsel—"I may review the material, and if I see anything that I need to redo or expand on, I may do that"—in context it was clear Dr. Drogin was indicating he intended to be fully prepared before giving his trial testimony, not that his assignment might expand into the area for which Van Dyke had been designated as Zuniga's expert witness.[6] Alexandria Care had no opportunity to depose Dr. Drogin concerning this new opinion or to have its own expert review his analysis. Under the circumstances the court reasonably determined it would be

---

[6] Dr. Drogin explained, "[A]s an expert, I feel it is my obligation to be as complete and accurate as possible. And if there is [something]—I should be prepared for any type of question you might ask; so that if there is something—when I review the material and my results, I may find some additional things that I need to study. I don't need to be asked by counsel to do that." Asked if he anticipated doing that, Dr. Drogin responded, "Absolutely. Before trial I'm going to be prepared, and I want to make sure I recall all the important issues and details. So I need to review the material and study it further so that I'll be prepared for trial. I mean statistical analysis is an ongoing process. As you study data, you learn more and more about the data, and that can affect the direction of your study and your methodology. So I want to make sure that I am confident in the results that I present."

18

improper to allow Dr. Drogin to provide opinion testimony that had not been disclosed in his expert report, during his deposition or even in his initial trial testimony. (See *Sargon Enterprises, Inc. v. University of Southern California* (2012) 55 Cal.4th 747, 773 (*Sargon*) ["[e]xcept to the extent the trial court bases its ruling on a conclusion of law (which we review de novo), we review its ruling excluding or admitting expert testimony for abuse of discretion"].)

   4. *The Trial Court Abused Its Discretion in Excluding Dr. Drogin's Expert Testimony*

Evidence Code section 801 provides, "If a witness is testifying as an expert, his testimony in the form of an opinion is limited to such an opinion as is: [¶] (a) Related to a subject that is sufficiently beyond common experience that the opinion of an expert would assist the trier of fact; and [¶] (b) Based on matter (including his special knowledge, skill, experience, training, and education) perceived by or personally known to the witness or made known to him at or before the hearing, whether or not admissible, that is of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates, unless an expert is precluded by law from using such matter as a basis for his opinion." Evidence Code section 802 authorizes the trial court to allow an expert to be examined before admitting the expert's opinion "concerning the matter upon which his opinion is based." An opinion based in whole or in part on an improper matter may be excluded. (Evid. Code, § 803.)

Analyzing these provisions of the Evidence Code, the Supreme Court in *Sargon, supra,* 55 Cal.4th 747 delineated the trial court's role in evaluating the admissibility of expert

testimony: "[U]nder Evidence Code sections 801, subdivision (b), and 802, the trial court acts as a gatekeeper to exclude expert opinion testimony that is (1) based on matter of a type on which an expert may not reasonably rely, (2) based on reasons unsupported by the material on which the expert relies, or (3) speculative." (*Id.* at pp. 771-772.) The *Sargon* Court cautioned, however, that this threshold responsibility is not unlimited: "The trial court's preliminary determination whether the expert opinion is founded on sound logic is not a decision on its persuasiveness. The court must not weigh an opinion's probative value or substitute its own opinion for the expert's opinion. Rather, the court must simply determine whether the matter relied on can provide a reasonable basis for the opinion or whether that opinion is based on a leap of logic or conjecture. . . . The goal of trial court gatekeeping is simply to exclude 'clearly invalid and unreliable' expert opinion." (*Id.* at p. 772.)

There can be no doubt Dr. Drogin's expert opinion analyzing Alexandria Care's meal break practices and the impact of its rounding policy would be admissible if it had been based on the PDF timekeeping and payroll records produced by Alexandria Care in discovery.[7] Such expert testimony analyzing an employer's records is commonplace in wage-and-hour and PAGA cases. (See, e.g., *Salazar v. See's Candy Shops, Inc.* (2021) 64 Cal.App.5th 85, 90; *Carrington v. Starbucks Corp.* (2018) 30 Cal.App.5th 504, 514.) Does the fact Dr. Drogin used the computer-readable spreadsheets created by iBridge spell the difference between his opinion being admissible or not? The trial

---

[7] As discussed, when objecting to Dr. Drogin's testimony, Alexandria Care did not challenge his qualifications as a statistician or data analyst.

court concluded it did, ruling Dr. Drogin's testimony "was without any foundation and would not be considered" because it was based on the iBridge spreadsheets the court had excluded from evidence.

Evidence Code section 801, however, does not limit an expert to the use of admissible evidence in forming an opinion. It expressly provides the basis for the opinion must be reliable, "whether or not admissible." (Evid. Code, § 801, subd. (b).) As our colleagues in Division Four of this court explained in *Olive v. General Nutrition Centers, Inc.* (2018) 30 Cal.App.5th 804, 821-822, "Expert opinion testimony may be based upon information furnished to the expert by others so long as the information is of a type reasonably relied upon by professionals in the relevant field. [Citations.] However, when the expert's opinion is not based on his own perception or knowledge, but depends instead upon information furnished by others, it is of little value unless the source is reliable. [Citations.] Thus, expert opinion testimony may not be based upon information furnished by others that is speculative, conjectural or otherwise unreliable." (See *Sargon*, *supra*, 55 Cal.4th at pp. 770-772 [discussing threshold requirement of reliability]; *Apple Inc. v. Superior Court* (2018) 19 Cal.App.5th 1101, 1120 [*Sargon* "merely ensures that expert opinion evidence is reasonable, reliable, and logical"]; see also *People v. Nieves*, *supra*, 11 Cal.5th at p. 440 ["'any material that forms the basis of an expert's opinion testimony must be reliable'"]; *People v. Veamatahau* (2020) 9 Cal.5th 16, 32 ["[T]estimony admitted under [Evidence Code] section 801 or 802 is subject to scrutiny on reliability grounds by the court and opposing counsel. . . . [A]n expert must establish that the basis for his or her opinion is sufficiently reliable such that it

21

'reasonably may be relied upon' by experts testifying on the same subject"].)  Accordingly, if the trial court rejected Dr. Drogin's testimony simply because it was based on inadmissible evidence, without further consideration of the reliability of the data used, the court committed legal error.

The trial court's ruling fares no better if we assume the court impliedly found the iBridge spreadsheets were not only inadmissible because they lacked foundation but also unreliable, as Alexandria Care argues on appeal.  As discussed, Dr. Drogin testified he had used electronic records from iBridge on 10 to 15 prior occasions; he was familiar with the processes and quality control measures iBridge used based on past discussions with iBridge personnel; and he was comfortable relying on the data iBridge provided to form his opinions.  Indeed, his consulting firm had recommended clients use iBridge in a number of cases where information was obtained in paper-copy format and needed to be converted to a computer-readable format such as Excel.  He also testified during his original testimony that he "did some comparison of the PDF's to the spreadsheet" and "[t]hey appeared to be the same."  The trial court was not obligated to accept Dr. Drogin's testimony as sufficient foundation for admission of the iBridge spreadsheets; but, in light of that testimony, there was no reasonable basis for the court to conclude they were not "of a type that reasonably may be relied upon by an expert in forming an opinion upon the subject to which his testimony relates," as required by Evidence Code section 801, subdivision (b).

Although we affirm the ruling excluding the spreadsheets as within the trial court's discretion, there was nothing speculative or conjectural about them.  (Cf. *Olive v. General*

*Nutrition Centers, Inc., supra,* 30 Cal.App.5th at p. 822 [because second expert's opinion was dependent on first expert's speculative assumptions, second expert's opinion was unreliable]; *Cooper v. Takeda Pharmaceuticals America, Inc.* (2015) 239 Cal.App.4th 555, 577 [expert's opinion based on assumptions of fact without evidentiary support or on speculative or conjectural factors may be excluded from evidence]; see also *Sargon, supra,* 55 Cal.4th at p. 776 [trial court properly found expert's methodology was too speculative for the evidence to be admissible].)  Issues as to the accuracy of iBridge's conversion work go to the weight of Dr. Drogin's testimony, not its admissibility, and was the proper subject of cross-examination by counsel for Alexandria Care.

In sum, the court's ruling excluding Dr. Drogin's testimony because it was based on iBridge spreadsheets exceeded the bounds of the court's discretion.  (See *Sargon, supra,* 55 Cal.4th at p. 773 ["A ruling that constitutes an abuse of discretion has been described as one that is 'so irrational or arbitrary that no reasonable person could agree with it.'  [Citation.]  But the court's discretion is not unlimited, especially when, as here, its exercise implicates a party's ability to present its case"].)

5.  *Exclusion of Dr. Drogin's Testimony Prejudiced Zuniga*

The trial court's error in excluding evidence is grounds for reversing a judgment only if the party appealing demonstrates a "miscarriage of justice"—that is, that a different result would have been probable if the error had not occurred.  (Evid. Code, § 354 ["[a] verdict or finding shall not be set aside, nor shall the judgment or decision based thereon be reversed, by reason of the erroneous exclusion of evidence unless the court which passes upon the effect of the error or errors is of the opinion that the

error or errors complained of resulted in a miscarriage of justice"]; Code Civ. Proc., § 475 ["[n]o judgment, decision, or decree shall be reversed or affected by reason of any error, ruling, instruction, or defect, unless it shall appear from the record that such error, ruling, instruction, or defect was prejudicial, and also that by reason of such error, ruling, instruction, or defect, the said party complaining or appealing sustained and suffered substantial injury, and that a different result would have been probable if such error, ruling, instruction, or defect had not occurred or existed"]; *College Hospital Inc. v. Superior Court* (1994) 8 Cal.4th 704, 715 ["trial error is usually deemed harmless in California unless there is a 'reasonabl[e] probab[ility]' that it affected the verdict"]; *Coyne v. De Leo* (2018) 26 Cal.App.5th 801, 824 [same]; see also *Colombo v. BRP US Inc.* (2014) 230 Cal.App.4th 1442, 1475 ["[a] 'miscarriage of justice' occurs when the party appealing shows that a 'different result would have been probable if the error had not occurred'"].)

Exclusion of Dr. Drogin's testimony concerning Alexandria Care's failure to provide meal breaks as required by section 512, subdivision (a),[8] and the impact of Alexandria Care's rounding policy on its obligation to compensate its employees for all time worked[9] unquestionably prevented Zuniga from establishing her PAGA claim. We recognize the trial court, as the finder of fact in

---

[8]   Dr. Drogin testified that 48.4 percent of shifts of five hours or longer reflected unrecorded meal periods, meal periods of less than 30 minutes or meal periods that commenced after the end of the fifth hour of work. Of shifts that were longer than 10 hours, 69.2 percent had no second meal period of at least 30 minutes.

[9]   Dr. Drogin identified 738 hours more in employee "punch time" than in paid time.

the case, might have viewed Dr. Drogin's testimony with skepticism in light of Zuniga's failure to introduce competent evidence specifically directed to the accuracy of the iBridge spreadsheets used in his analysis. But the threshold question of admissibility and the evaluation of the weight to be given the properly admitted testimony of a highly qualified expert are very different issues. Because Alexandria Care elected to rest without presenting any evidence contesting Dr. Drogin's opinions, we are unable to say total exclusion of his testimony was harmless. (Cf. *Brown v. Colm* (1974) 11 Cal.3d 639, 647 ["the exclusion of the sole expert relied upon by a party because of an erroneous view of his qualifications is, in a case where expert testimony is essential, an abuse of discretion as a matter of law requiring reversal"]; *Gordon v. Nissan Motor Co., Ltd.* (2009) 170 Cal.App.4th 1103, 1114 ["when a trial court erroneously denies *all* evidence relating to a claim, or *essential* expert testimony without which a claim cannot be proven, the error is reversible per se because it deprives the party offering the evidence of a fair hearing and of the opportunity to show actual prejudice"].)[10]

---

[10] As discussed, describing Zuniga's claims for failure to maintain required employee records, failure to provide accurate itemized wage statements and failure to pay all wages due to terminated employees as "derivative" of her primary claims for meal and rest break violations, unpaid overtime and failure to pay minimum wages, the trial court ruled "her derivative claims must fail also." Because we reverse the court's ruling concerning those primary claims, we necessarily reverse this derivative ruling, as well.

## DISPOSITION

The judgment is reversed, and the cause remanded for a new trial.  Zuniga is to recover her costs on appeal.


PERLUSS, P. J.

We concur:


SEGAL, J.


FEUER, J.