Filed 6/4/26  Rados v. Travelers Casualty and Surety Co. CA2/5

**NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS**

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION FIVE

| | |
|---|---|
| STEVE P. RADOS, INC., <br><br> Plaintiff, Cross-defendant, and Appellant; <br><br> TRAVELERS CASUALTY AND SURETY COMPANY OF AMERICA, <br><br> Cross-defendant and Respondent, <br><br> v. <br><br> BLACK & VEATCH CONSTRUCTION, INC., | B339848 c/w B340974 <br><br> (Los Angeles County Super. Ct. No. 20STCV15277) |

Defendant, Cross-complainant, and Appellant;

FEDERAL INSURANCE COMPANY et al.,

Defendants and Appellants.

APPEALS from a judgment of the Superior Court of Los Angeles County, J. Stephen Czuleger, Judge. Affirmed in part, reversed and remanded in part for further proceedings with directions.

Monteleone & McCrory, Diana M. Dron, Michael F. Minchella, Litsa Georgantopolous; Benedon & Serlin, Judith E. Posner, Kelly R. Horowitz; Nida & Romyn and Douglas Yokomizo for Plaintiff, Cross-defendant, and Appellant Steve P. Rados, Inc.

Monteleone & McCrory, Diana M. Dron, Michael F. Minchella, Litsa Georgantopolous; Nida & Romyn and Douglas Yokomizo for Cross-defendant and Respondent Travelers Casualty and Surety Company of America.

Burke, Williams & Sorensen, Timothy A. Colvig, David Darroch, David J. Hyndman; Hicks Thomas, John B. Thomas, Eric Grant; Stris & Maher and Rachana A. Pathak for Defendant, Cross-complainant, and Appellant Black & Veatch Construction, Inc.

SMTD Law and Jonathan J. Dunn for Defendants and Appellants Federal Insurance Company, Fidelity and Deposit Company of Maryland, and Zurich American Insurance Company.

\* \* \* \* \* \*

California Water Service Company (Cal Water), a private utility company, hired a general contractor to design and build a new pump station and seven miles of underground piping to serve the Palos Verdes Peninsula, and the general contractor hired a subcontractor to do most of the construction.  The general contractor eventually terminated the subcontractor, and the general contractor and subcontractor (and their sureties) sued each other.  After a five-week trial, a jury found that the termination was without cause and awarded the subcontractor more than $12 million in damages.  Both sides have appealed.  We conclude that the jury's finding that the termination was without cause was not tainted by instructional error; that a new trial on damages is required because the trial court erred in not deciding—and thereby not instructing the jury—which damages provision of the subcontract was controlling and what that provision meant; that the general contractor is entitled to a $2.4 million chargeback during the new trial; and that the subcontractor is not entitled to seek prompt payment penalties. We accordingly affirm the judgment for the subcontractor in part and remand in part for a limited new trial on the issue of damages.

## FACTS AND PROCEDURAL BACKGROUND

### I. Facts

#### A. *Cal Water Hires a general contractor*

Cal Water is a private utility company that California communities have hired to supply water. After more than a decade of study, Cal Water concluded that the "water supply system" to the Palos Verdes Peninsula, one of the communities it serves, needed "substantial capital improvements to its pumping and pipeline transmission facilities." Cal Water entered into a $80 million contract with Black & Veatch Construction, Inc. (B&V), pursuant to which B&V would act as the general contractor in designing and building a new pump station and seven miles of underground pipeline. The initial contract was executed in December 2016, and the operative version was executed on May 8, 2018.

#### B. *B&V Hires a subcontractor*

On May 16, 2018, B&V entered into a $29.25 million contract with Steve P. Rados, Inc. (Rados), a contractor that has been serving government clients in the heavy construction industry for nearly a century. Under this contract (the Subcontract),[1] Rados would act as B&V's subcontractor and would be responsible for 85 to 90 percent of the "build" portion of the project—and, more specifically, for trenching, laying, and covering approximately seven miles of underground piping as well as building a pump station on Crenshaw Boulevard.

---

[1]     All further statutory references are to the Subcontract unless otherwise indicated.

4

The Subcontract had the following pertinent terms:

1.  *Pertinent terms regarding payment*

    a.  Progress payments

On a monthly basis, Rados was to submit "pay applications" to B&V detailing the specific "work . . . performed" in the prior month in several different categories, the approximate percentage of the Subcontract's completion in those categories, and the corresponding monetary amount owed for the completion in each category for that period. (§ 552.4.1.) B&V was then obligated to pay these monthly "progress payments," but could withhold (1) a 10-percent retention payment "until the Project has achieved [] 50% [] completion" (§ 552.4.3), and (2) any "amounts due under th[e] Subcontract . . . arising out of or related to [Rados's] breach or reasonably anticipated breach of th[e] Subcontract" (§ 552.4.4).

    b.  Extra-work payments

The Subcontract also authorized Rados to submit separate "[c]laims for extra compensation" for work it performed over and above that contemplated by the Subcontract. (§ 552.18.) Before those extra-work claims were paid, B&V had the option of revising the Subcontract or, if greater speed was necessary, issuing a Work Authorization with the intent to revise the Subcontract in the future. (§§ 552.18, 552.19.2, 552.19.3.)

2.  *Pertinent terms regarding termination of the Subcontract*

Under the Subcontract, B&V possessed the right "at any time and in its sole discretion, [to] terminate all or part of" Rados's "Work" (§ 552.24.1), where "Work" is defined as "that which [Rados] is to perform or provide under th[e] Subcontract" (§ 552.1). The consequences of termination turned on whether it

5

was a "Termination for Cause" or a "Termination Without Cause."

### a. Termination for cause

Under the Subcontract, a termination by B&V is "for cause" if (1) Rados had "default[ed] in any obligation under th[e] Subcontract" and (2) "d[id] not cure th[at] default within ten calendar days after receipt" of notice by B&V of the default. (§ 552.23.1.) As pertinent here, "cause" includes a "failure [by Rados] to comply with . . . the Loss Control Manual." (§ 554.3.1.) That manual "provides an administrative structure within which [subc]ontractors" are to comply with various safety requirements; the manual authorizes termination of the Subcontract after (1) "[r]epeated nonconformance with the Project Loss Control Program" (which sets workplace standards stricter than OSHA requirements) "and" (2) "repeated failure to comply with correction directives."[2] (Manual, § 1.3.2.3.)

If B&V terminates the Subcontract for cause, Rados is "not [] entitled to recover from [B&V] any damages, losses, costs or expenses related to or arising out of the terminated portion of the Work," and Rados's recovery is in any event capped at "an amount commensurate with the ratio that the terminated Work accepted by [B&V] bears to all of the Work." (§ 552.23.4.) What is more, B&V retains the right to sue Rados "for actual damages and to exercise all other remedies which are available to it under

---

[2] Verbatim, this section reads: "Repeated nonconformance with the Project Loss Control Program and repeated failure to comply with correction directives may result in removal of Contractor management from the project site or termination of the contract."

6

this Subcontract, under the security instruments and under Applicable Law."  (§ 552.23.7.)

b.     Termination without cause

If B&V terminates the Subcontract in a way that does not satisfy the definition of a "termination for cause" (§ 552.23.6), Rados is entitled to "recover from [B&V], as the complete and final settlement for the terminated Work and all related Claims, a sum equal to [(1) Rados's] direct cost for the terminated Work satisfactorily performed as of the effective date of termination, plus [(2)] an allowance for reasonable overhead and profit on such direct cost" (§ 552.24.4).  This measure of damages is "the sole and exclusive remedy" available to Rados "arising out of or related to termination" without cause; consequently, Rados is explicitly precluded from recovering from B&V any other "damages, losses, costs or expenses related to or arising out of the terminated portion of the Work."  (§ 552.24.6.)

C.     *B&V terminates all of Rados's work on the Subcontract*

On October 4, 2019, B&V sent a letter to Rados terminating all of Rados's work on the Subcontract.  B&V cited two reasons for the termination—namely, that (1) Rados had failed to "provide a recovery schedule for . . . [the] Pump Station Work," and (2) Rados had "fail[ed] and refus[ed] to provide an adequate cure plan for the ongoing safety issues for this Project" as mandated by the Loss Control Manual.

The termination was "immediately" "effective."

D.     *B&V settles all claims with Cal Water*

Cal Water and B&V also had a fee and schedule dispute, and they resolved that dispute in a settlement agreed to in

7

November 2022 under which Cal Water paid B&V a "[f]inal [c]ompletion [p]ayment" of $13,853,014.

## II.    Procedural Background

### A.    *Cross-complaints*

#### 1.    *Rados's complaint*

In April 2020, Rados sued B&V, Cal Water, and B&V's payment bond sureties.[3]  More specifically, Rados sued B&V for (1) breach of contract, (2) abandonment of contract, (3) quantum meruit, (4) foreclosure of a mechanic's lien, (5) recovery of statutory prompt payment penalties, and (6) recovery on a payment bond.[4]  Rados's mechanic's lien claim was resolved when B&V posted a bond releasing that lien.

#### 2.    *B&V's cross-complaint*

Two months later, in June 2020, B&V sued Rados and its performance bond surety.[5]  More specifically, B&V sued Rados for (1) breach of contract, (2) declaratory relief, and (3) specific performance.  Prior to trial, B&V dismissed its declaratory relief and specific performance claims.

---

[3]    B&V's sureties are Federal Insurance Company, Fidelity and Deposit Company of Maryland, and Zurich American Insurance Company.

[4]    Rados sued Cal Water for (1) foreclosure of a mechanic's lien and (2) enforcement of a stop payment notice.  Those claims were resolved prior to trial.  Rados sued the sureties for recovery on the payment bond.

[5]    Rados's surety is Travelers Casualty and Surety Company of America; B&V sued the surety for (1) breach of contract, (2) breach of the performance bond, and (3) declaratory relief.

**B.** *Trial and verdict*

The matter proceeded to a 25-day jury trial over the course of five weeks in late February through April 2024. Because the sureties stipulated that their claims and liability were wholly derivative of their insureds, and that Rados's claim for recovery on the payment bond would be bifurcated, only B&V and Rados were directly involved in the trial. Through the course of the trial, the trial court granted a nonsuit on Rados's claims for contract abandonment and quantum meruit, and granted a directed verdict for B&V on Rados's claim for prompt payment penalties after ruling that Rados had abandoned that claim. The only claims that were presented to the jury at the end of trial were B&V's and Rados's competing claims for breach of contract.

B&V and Rados had also reached a stipulation, on the eve of trial, under which B&V agreed to "credit" Rados around $3,000,000[6] to resolve dozens of Rados's extra-work claims. In defining "credit," the parties agreed that the stipulated amount would either (i) "be accounted for in the damages awarded to Rados," in the event the jury found in favor of Rados, or (ii) "be an offset against the damages awarded to" B&V, in the event the jury found in favor of B&V.

The parties presented the jury with competing requests for damages.

1. *B&V's calculation of damages*

B&V advocated for one of two alternative damages awards.

First, B&V argued that its termination of Rados was "for cause," such that under the Subcontract, B&V was entitled to its

---

[6] The parties disagree over what the stipulated amount was: B&V's expert calculated it as $2,904,262, while Rados's counsel calculated it as $3,099,624.

"actual damages" of $11.6 million, which corresponded with the amount B&V had to pay the subcontractors it hired to complete Rados's unfinished work under the Subcontract, offset by, among other things, the stipulated credit for Rados's extra-work claims.

Second and alternatively, B&V argued that, even if its termination of Rados had been "without cause," such that B&V owed Rados money, the appropriate damages award for Rados was limited to $3.446 million. B&V calculated this figure as follows:

-- The "direct cost" of the work Rados had completed on the project came to $22,205,607, which was taken directly from Rados's "cost report" prepared after the date of termination, adjusted to subtract "administrative" costs, attorney fees, and costs to close out the Subcontract.

-- An "allowance for reasonable overhead and profit on such direct cost" of 16.4 percent, which is the precise "markup or margin" that Rados anticipated on the Subcontract as reflected in its budget and bidding documents, and which came to $3,641,720.

-- From this $25,847,327 total amount due to Rados, B&V subtracted the $19,468,695 it had already paid Rados, leaving a total of $6,378,632.

-- From that $6,378,632 amount, B&V subtracted (1) $2,454,832 in "back charges" corresponding to labor or materials for which B&V had already paid Rados but which, due to Rados's lack of completion of the labor or failure to leave materials behind, B&V had to pay for a second time—namely, (a) the cost of removing debris (also called a "spoils pile") from some of the work sites, and (b) the cost of repurchasing piping material; and (2) $477,863 for delays caused by B&V having to replace Rados with new subcontractors.

10

--       This left a net amount due to Rados of $3,445,937. B&V's calculation did not account for the stipulated credit for Rados's extra-work claims.

2.       *Rados's calculation of damages*

Rados urged that it should be awarded $12,265,256 in damages. Rados calculated this figure as follows:

--       Under all of the pay applications through the time of termination (including the application for the first four days in October 2019, which alone came to more than $1.5 million so Rados could "catch[] up" the percentages of completed work from previous pay periods), Rados was owed $25,426,846. Because B&V had paid $19,468,695 in progress payments, Rados still owed a balance of $5,958,152 on the outstanding payment applications.

--       Rados was owed another $6,307,104 in extra work compensation, comprised of (1) $3,099,624 for the stipulated credit for its extra-work claims, and (2) an additional $3,207,480 in extra work claims that B&V disputed.

--       This came to a total of $12,265,256.

The trial court refused B&V's request to instruct the jury to apply the direct cost-plus-profit/overhead formula set forth in Section 552.24.4 of the Subcontract, and refused Rados's request to instruct the jury on the parties' competing definitions of the phrase "terminated Work" in Section 552.24.2.

The verdict form was a general verdict with a single line for damages.

The jury found "in favor of Rados" on its breach of contract claim, and awarded Rados almost exactly amount it requested— $12,265,258.

11

C. *New trial motion*

B&V moved for a new trial, seeking either a new trial or a remittitur of damages, on the ground that, as pertinent here, the court did not give "key jury instructions . . . on crucial liability and damages issues," including the failure to instruct the jury to look to Section 552.24.4 when fixing damages for a termination without cause.

The trial court denied the motion on June 14, 2024, finding no error because B&V was merely "attempt[ing] to recast its contract arguments into jury instructions."

A few months later, the trial court issued an amended judgment that awarded Rados an additional $2,952,972 in attorney fees, $653,581.61 in costs, and $3,720,490 in prejudgment interest—for a final judgment of $19,592,301.60.

D. *Appeals*

Following entry of the amended judgment, both B&V and Rados appealed.[7]

## DISCUSSION

In its appeal, B&V challenges (1) one of the jury instructions bearing on whether Rados had been terminated "for cause," (2) the trial court's failure to interpret the Subcontract's provision setting the measure of damages if Rados was terminated "without cause" and instructing the jury regarding that provision, and (3) the jury's refusal to deduct any back charges from the damages award. In its appeal, Rados challenges the trial court's grant of a directed verdict on its claim for prompt payment penalties. We address the liability issues first, then turn to the remaining issues bearing on remedies.

---

[7] Earlier appeals from the judgment were folded into these last-filed appeals.

12

# I.     Liability

B&V argues that the trial court erred in refusing to give its "Special Instruction No. 10," which sought to address B&V's interpretation of the provision in the Loss Control Manual allowing it to terminate the Subcontract "for cause."[8]

B&V's proffered instruction provided, in pertinent part, that:

> "Section 1.3.2.3 of the Loss Control Manual made part of the party's subcontract . . . contains, in part, the following language:
>
> *Repeated nonconformance with the Project Loss Control Program <u>and</u> repeated failure to comply with correction directives may result in . . . termination of the contract.*

---

[8]     B&V also argues that the trial court erred in refusing to give its "Special Instruction No. 9," which would have provided that "The parties' Subcontract contains various provisions for remedies relating to various potential contract breaches.  Unless a remedy provision indicates it is the only remedy for a breach, it is not [B&V's] only remedy if other contractual or legal remedies are available."  The court did not err in declining to give this instruction because this instruction was unnecessary.  (E.g., *Olive v. General Nutrition Centers, Inc.* (2018) 30 Cal.App.5th 804, 815 [affirming refusal to give jury instruction that was "unnecessary"].)  It was unnecessary because the Subcontract granted B&V the right to terminate the Subcontract with or without cause, so an exercise of that right would not have constituted a breach *by B&V*.  It was also unnecessary because the Subcontract expressly indicated that B&V's remedies were not limited when termination was for cause, and was silent regarding available remedies when termination was without cause; in neither circumstance did the Subcontract purport to limit B&V's remedies.

13

> You are instructed that, in your deliberations, you are to treat that phrase as requiring *either* repeated nonconformance with the Project Loss Control Program or repeated failure to comply with correction directives as sufficient to result in . . . termination of the contract. Both are not required in order to result in . . . termination of the contract."

(Italics in original; underscoring added.) The trial court declined to give that instruction.

We review de novo the trial court's ruling not to give this instruction, whether we view B&V's claim as an attack on the court's mid-trial ruling on jury instructions (*Martinez v. Rite Aid Corp.* (2021) 63 Cal.App.5th 958, 969 (*Martinez*)) or instead as an attack on the trial court's denial of B&V's new trial motion on the ground that the refusal to give the instruction constitutes an "[e]rror in law" (Code. Civ. Proc., § 657, subd. (7) [new trial may be granted for an "[e]rror in law"]; *Argueta v. Worldwide Flight Services, Inc.* (2023) 97 Cal.App.5th 822, 832-833 [rulings attacked in a new trial motion should be evaluated "'under the test appropriate'" to those rulings]).

The trial court did not err in refusing to give B&V's Special Instruction No. 10. That instruction told the jury that the Loss Control Manual's mandate that a termination of the Subcontract was justified when Rados engaged in "[r]epeated nonconformance with the Project Loss Control Program *and* repeated failure to comply with correction directives" meant that termination was justified when Rados engaged in "repeated nonconformance with the Project Loss Control Program *or* repeated failure to comply with correction directives." (Italics added.) In other words, B&V asked the court to instruct the jury that "and" meant "or." This

14

instruction was critical to B&V's claim that it terminated Rados "for cause" because it was undisputed at trial that Rados incurred seven notices of violation of the Project Loss Control Program but it was contested whether Rados took corrective measures for each incident.

As a general rule, "and" means "and"—not "or." (*People v. Reynoza* (2024) 15 Cal.5th 982, 990 ["'The ordinary and usual usage of "and" is as a conjunctive'"]; *In re C.H.* (2011) 53 Cal.4th 94, 101 [same]; *Pulsifer v. United States* (2024) 601 U.S. 124, 133 ["'And,' in grammatical terms, is of course a conjunction"]; see generally *Dow v. Honey Lake Valley Resource Conservation Dist.* (2021) 63 Cal.App.5th 901, 903-904 ["In law, semantics matter"].) To be sure, "and" can *sometimes* mean "or," but only in "exceptional" cases where the need for such a counter-intuitive reading is warranted by the "context in which one or the other of these words appears." (*Reynoza*, at p. 991; *Heidlebaugh v. Miller* (1954) 126 Cal.App.2d 35, 38.)

Here, the context favors reading "and" to mean "and." For starters, the two conditions listed—repeated nonconformance with the Project Loss Control Program and failure to comply with correction directives—are interrelated because a failure to comply with correction directives (which are aimed at curing nonconformance) necessarily follow nonconformance; indeed, the Loss Control Manual requires B&V to inform Rados of the nonconformance in a formal, written violation notice that sets forth a period during which Rados must take corrective action. Thus, we decline B&V's request to analogize the language in the Loss Control Manual to a sentence like "doctors and lawyers may be required to show proof of license." In B&V's proffered sentence, reading "and" as "or" makes sense because the two

15

words linked by "and"—doctors and lawyers—are independent; the same is not true of the two linked phrases in the Loss Control Manual. Further, given the severity of the remedy of termination, it makes sense that Rados would become eligible for termination only after repeatedly failing to conform with the Loss Control Manual's safety protocols *and* refusing to comply with directives to cure that nonconformance. Although, as B&V points out, Section 1.1.4 of the Loss Control Manual seems to suggest a stricter "no tolerance" policy for safety insofar as it provides that "[t]he violation of any of these rules will result in termination and/or removal from the project," this language refers to the more modest remedy of terminating *an employee* working on the project, not the more thermonuclear remedy of terminating *the Subcontract*. Contrary to what B&V suggests, our plain-text reading of the Loss Control Manual does not undervalue the important of public policy favoring public safety (e.g., *Green v. Ralee Engineering Co.* (1998) 19 Cal.4th 66, 82-83 [""""[t]here is no public policy more important or more fundamental than the one favoring the effective protection of the lives and property of citizens"""""]) because the Loss Control Manual already requires "*repeated* nonconformance" before termination is possible, and because the only way Rados can avoid termination is if it consistently cures any lapse in conformance, thereby assuring a safe working environment.

## II. Remedies

### A. *Damages*

#### 1. *Formula for measuring damages*

B&V argues that the trial court erred (1) in refusing to instruct the jury that, if the jury found Rados was terminated without cause, then the jury must apply the direct cost-plus-

16

overhead/profit formula set forth in Section 552.24.4 of the Subcontract, and (2) in not interpreting for the jury that, in Section 552.24.4, the "direct cost for the *terminated Work satisfactorily performed*" means the direct costs of the tasks Rados *had already performed* under the Subcontract, such that the direct cost-plus-overhead/profit formula limits the amount Rados can recover for the work it had already performed.  (Italics added.)

As noted above, we review de novo the trial court's ruling not to give these instructions, whether we view B&V's challenges on appeal as an attack on the court's mid-trial ruling on jury instructions (*Martinez, supra*, 63 Cal.App.5th at p. 969) or instead as an attack on the trial court's denial of B&V's new trial motion on the ground that the refusal to give these instructions constituted an "[e]rror in law" (Code Civ. Proc., § 657, subd. (7); *Fennessey v. Pacific Gas & Electric Co.* (1938) 10 Cal.2d 538, 544 ["Errors in instructions . . . constitute errors in law, . . . for which a new trial may be granted"]).

The trial court erred in not instructing the jury to apply the direct cost-plus-overhead/profit formula set forth in Section 552.24.4 of the Subcontract and in not interpreting the Subcontract to mean this formula applies to—and limits— Rados's recovery for the work it had already performed on the Subcontract.

To begin, the trial court *itself* erred in not interpreting the Subcontract.  Where, as here, no extrinsic evidence was introduced on the meaning of a provision of the Subcontract, it was the duty of the trial court—not the jury—to interpret the contract and, thereafter, to instruct the jury on that meaning. (*City of Hope National Medical Center v. Genentech, Inc.* (2008)

17

43 Cal.4th 375, 395 [interpretation of written instrument is solely a judicial function "when it is based on the words of the instrument alone, when there is no conflict in the extrinsic evidence"]; *Horsemen's Benevolent & Protective Assn. v. Valley Racing Assn.* (1992) 4 Cal.App.4th 1538, 1559 (*Horsemen's*) ["it is solely a judicial function to interpret a written instrument unless the interpretation turns upon the credibility of extrinsic evidence"]; *Foxcroft Productions, Inc. v. Universal City Studios LLC* (2022) 76 Cal.App.5th 1119, 1133 [trial court committed error in "allow[ing] the jury to interpret the contract"].)  Indeed, even Rados recognized that the trial court here should have interpreted the meaning of the Subcontract's terms.

Further, the interpretation of the Subcontract advanced by B&V is the only reasonable interpretation.  In interpreting the meaning of a contract, our goal is to give effect to the mutual intention of the parties, which is best reflected in the contract's express language.  (Civ. Code, §§ 1636, 1638, 1639; *Hartford Casualty Ins. Co. v. Swift Distribution, Inc.* (2014) 59 Cal.4th 277, 288; *Brown v. Goldstein* (2019) 34 Cal.App.5th 418, 432; see also Civ. Code, § 1643 ["A contract must receive such an interpretation as will make it lawful, operative, definite, reasonable, and capable of being carried into effect, if it can be done without violating the intention of the parties"].)

The plain text of the Subcontract makes clear that Section 552.24.4 provides the "sole and exclusive remedy" to Rados "arising out of or related to termination" of the Subcontract by B&V "without cause."  (§§ 552.24.4, 552.23.6.)  Neither party disputes the applicability of Section 552.24.4 in this context.

Instead, what the parties dispute is the meaning of Section 552.24.4.  That section limits Rados's recovery to its "direct cost

18

*for the terminated Work satisfactorily performed* as of the effective date of termination, plus an allowance for reasonable overhead and profit on such direct cost." (Italics added.) B&V argues that "terminated Work satisfactorily performed" refers to the work Rados has already completed on the Subcontract (and thus caps Rados's recovery for that completed work), while Rados argues that "terminated Work satisfactorily performed" refers to work Rados has *yet to complete* under the Subcontract (and thus limits recovery only on that uncompleted work and allows Rados to collect greater amounts—including the full amounts requested in all of its pre-termination payment applications—for the work it has already completed).

B&V's interpretation is the only reasonable interpretation. The Subcontract does not define the phrase "terminated Work." However, because the Subcontract explicitly grants B&V the unfettered right to terminate "all *or part* of" Rados's "Work" under the Subcontract (§ 552.24.1, italics added), the Subcontract contemplates—should B&V only terminate "part" of Rados's "Work"—that Rados would simultaneously have "terminated Work" *and* "non-terminated Work." (To illustrate, B&V could have terminated Rados as to its construction of the pumping station but not as to its trenching of the pipeline.) The plain text of Section 552.24.4 operates to limit Rados's recovery as to any and all "Work" for which Rados's services have been "terminated"—which, in this case, was *all* of its "Work." Where, as here, B&V accepted that Work as being "satisfactorily performed," Rados's recovery on that completed work is capped at the direct cost-plus-overhead/profit maximum.

The trial court's failure to instruct the jury that it must look to Section 552.24.4 should it find that Rados's termination

19

was "without cause," and that it must apply the direct cost-plus-overhead/profit formula to Rados's completed work, was undeniably prejudicial to B&V in this case.  (See *TRC Operating Co., Inc. v. Chevron USA, Inc.* (2024) 102 Cal.App.5th 1040, 1098 [instructional error must be "prejudicial," meaning "there is a reasonable probability that in the absence of the error, a result more favorable to the appealing party would have been reached"].)  The jury awarded nearly the precise amount of damages Rados sought, and Rados's proffered calculation of that amount did not apply the direct cost-plus-overhead/profit formula required by the Subcontract (and yielded a recovery several times greater than that formula dictated).  Because the absent instructions interpreting the contract for the jury led to a miscalculation of damages, the trial court erred in denying B&V's motion for a new trial.  (*Grail Semiconductor, Inc. v. Mitsubishi Electric & Electronics USA, Inc.* (2014) 225 Cal.App.4th 786, 794-795 ["incorrect[]" "calculat[ion]" of damages "warranted a new trial using the correct measure of value"]; *Mock v. Michigan Millers Mutual Ins. Co.* (1992) 4 Cal.App.4th 306, 325-327 [new trial warranted where jury "clearly miscalculated" damages]; *Smyth v. Tennison* (1914) 24 Cal.App. 519, 521 [new trial warranted where contract interpretation was erroneous]; see generally *David v. Hernandez* (2014) 226 Cal.App.4th 578, 590-592 [denial of a new trial motion is reviewed for an abuse of discretion, but a trial court abuses its discretion in denying relief when there is a prejudicial error in law].)

Rados resists this conclusion with what boil down to four categories of arguments.

First, Rados argues that our interpretation of the phrase "terminated Work" as referring to the work Rados has already

completed under the Subcontract is incorrect.[9]  It urges that "Work" is a "forward-looking" concept, and cites Sections 552.24.1, 552.24.2, and 552.24.3 of the Subcontract, all of which use the phrases "terminated Work" or "Work [that] is terminated."  We reject the notion that "Work" under the Subcontract is inherently *only* forward-looking or *only* backward-looking:  On day 1 of the Subcontract, all of the "Work" to be performed under the Subcontract was necessarily forward-looking, but by month 16 of the Subcontract (when B&V terminated Rados), some of the "Work" had been completed by Rados and accepted by B&V (and hence was backward-looking), and some of the "Work" had yet to be completed by Rados (and hence was forward-looking).  The provisions Rados cites are unhelpful.  Section 552.24.1 obligated B&V to "provide a written notice" to Rados "specifying the extent to which the Work is terminated"; section 552.24.2 obligated Rados, at B&V's request, to "preserve and protect the Work purchased for or committed to the terminated Work, pending [B&V's] instructions"; and section 552.24.3 obligated Rados, at B&V's request, to "promptly assign" to B&V or Cal Water, Rados's "rights, title, and interest to the Work purchased for or committed to the terminated Work." Section 552.24.1 does not speak to the timing of the "Work" at all, and sections 552.24.2 and 552.24.3 contemplate that Rados may have incurred compensable direct costs in doing Work that would need to be completed by another subcontractor before the project was completed; these provisions are consistent with our

---

9      Rados also seems to argue that *the jury* rejected our interpretation of the Subcontract.  However, because the issue is one of law for the court, the jury's misinterpretation of the Subcontract is irrelevant.

21

interpretation of the phrase "terminated Work" and, contrary to what Rados suggests, do not somehow obligate Rados to complete the entirety of the Subcontract despite being terminated.

Second, Rados argues that our construction of the phrase "terminated Work" should be rejected because it leads to absurd and unfair results.  (Civ Code, § 1638; *Sacks v. City of Oakland* (2010) 190 Cal.App.4th 1070, 1082.)  Rados asserts that reading "terminated Work" to refer to work that Rados has already completed would retroactively—and, in its view, absurdly and unfairly—convert this fixed-price Subcontract (which assured Rados a fixed amount for the completion of the entire Subcontract and thereby a right to recognize greater profits if Rados kept its costs especially low) into a "cost-plus"-profit contract.  Rados further asserts that our construction means it will receive nothing for its completed work on the Subcontract.  Rados is correct that our interpretation of Section 552.24.4 caps Rados's recovery to its direct costs plus its overhead/profit on the Work it completed under the Subcontract (rather than getting the full amount it requested in all of its pay applications which are tethered to the fixed price of the Subcontract, not to Rados's actual direct costs).  But that result is neither absurd nor unfair.  Rados is a sophisticated business that negotiated the terms of the Subcontract at arm's length; Rados agreed in that Subcontract to grant B&V an unfettered right to terminate the Subcontract "at any time and in its sole discretion," and to limit its own recovery in the event that termination was without cause to direct cost-plus-overheard/profit; Rados thus had no *right* to complete the Subcontract or to obtain the fixed price for the total Subcontract.  It is neither absurd nor unfair to hold Rados to the bargain it negotiated.  (*DVD Copy Control Assn., Inc. v. Kaleidescape, Inc.*

(2009) 176 Cal.App.4th 697, 725 [a "court may not remake [a] bargain to the advantage of one party for no reason other than that the party has become dissatisfied with the agreement"].) Rados's further assertion that it will receive nothing for its completed Work is incorrect. Rados has already been paid $19,468,695.10 on the Subcontract; whether it receives any *more* turns on whether the direct cost-plus-overhead/profit formula entitles Rados to any more. But to imply that it worked for 16 months *gratis* is hyperbolic and untrue.

Third, Rados argues that B&V invited the trial court's instructional error. A litigant "invites error"—and thus is barred from complaining about that error on appeal—if it "mislead[s] the trial court" (*Norgart v. Upjohn Co.* (1999) 21 Cal.4th 383, 403) or otherwise engages in "affirmative conduct demonstrating a deliberate tactical choice" (*Huffman v. Interstate Brands Corp.* (2004) 121 Cal.App.4th 679, 706). B&V did not invite error regarding its position that Section 552.24.4 provides the controlling formula for damages if Rados was found to have been terminated without cause or its position that this formula applies to Rados's completed work under the Subcontract: B&V requested an instruction on the former (in Special Instruction No. 1), and introduced testimony to substantiate the latter. B&V also did not invite error by failing to file a motion requesting the trial court to bifurcate the legal question of the Subcontract's interpretation (for the court) from the factual questions of whether Rados's termination was for cause and how to apply that formula (for the jury) because B&V's request that the court instruct the jury with Special Instruction No. 1 was, in effect, a request that the trial court engage in the required contractual interpretation and then instruct the jury on its interpretation, a

23

position that B&V maintained in its motion for new trial when it insisted that it was "the court's duty to interpret the contract." Rados argues that B&V invited error by opposing Rados's proposed jury instruction that would have presented to the jury competing definitions of "terminated Work" and by advocating for B&V's definition before the jury through its expert (and opposing Rados's efforts to foreclose the expert's testimony), but B&V's conduct is entirely consistent with believing that the interpretation of the Subcontract was a legal question for the court (and thus one that should not be presented to the jury at all) and entirely consistent with rolling with the punches after the court refused to instruct on its definition and left the issue of interpretation to the jury (*Horsemen's*, *supra*, 4 Cal.App.4th at pp. 1555-1556 [litigant does not invite instructional error when it acts defensively after the court refuses its proffered instruction]). Rados lastly contends that B&V did not propose a jury instruction regarding the meaning of "terminated Work," but failing to do so does not constitute invited error (because it was in no way misleading to the court), and it also does not constitute a forfeiture (because B&V did request Special Instruction No. 1 and because it was the trial court's duty to interpret the Subcontract). (*Alaniz v. Sun Pacific Shippers, L.P.* (2020) 48 Cal.App.5th 332, 339 ["the failure to request correct instructions does not forfeit a challenge to jury instructions that erroneously contain legal standards inapplicable to the facts"]; see also *McCarty v. Department of Transportation* (2008) 164 Cal.App.4th 955, 984 [trial court "has the power to grant a new trial based on even an invited error" because if error appears in the record, court's power to grant new trial "''is not limited by the conduct of the parties in inviting such error'''"; "'''to hold otherwise would mean

24

that the trial court, by reason of the action of the parties, would be powerless to correct what might be an obvious miscarriage of justice"'"'"].)

Lastly, Rados urges that any error was not prejudicial because the Subcontract was admitted into evidence and before the jury, who could turn to Section 552.24.4 and apply that provision's formula for damages. This argument ignores that the task of interpreting the Subcontract was the court's, that the jury misinterpreted the Subcontract, and that the jury awarded damages based on that misinterpretation.

Because the trial court prejudicially erred in not instructing the jury to apply the direct cost-plus-overhead/profit measure set forth in Section 552.24.4 if it found B&V terminated Rados without cause and in not interpreting the phrase "terminated Work," the trial was infected with an error in law as to damages that warrants a new trial on that limited issue.[10]

2.     *Jury's rejection of back charges*

B&V argues that the jury erred in not finding that it was entitled to back charges of $2,454,832 for the cost of removing spoils from the work sites and purchasing piping material for which it had already paid Rados.[11]  This argument is an attack on

_____

[10]    Although Section 552.24.4 states that Rados's damages under the direct cost-plus-overhead/profit formula shall constitute "the complete and final settlement for the terminated Work and all related Claims," the parties' stipulation requires B&V to "credit" Rados around $3,000,000 more in extra-work claims.

[11]    B&V makes no argument on appeal that it was entitled to back charges of $477,863 for the delays caused by having to replace Rados with new subcontractors.

the factual sufficiency of the jury's verdict; as such, our review is for substantial evidence. (*Western States Petroleum Assn. v. Superior Court* (1995) 9 Cal.4th 559, 571.) Because B&V had the burden of proving the amount of back charges (*David S. Karton, a Law Corp. v. Musick, Peeler & Garrett LLP* (2022) 83 Cal.App.5th 1027, 1040 ["The party 'seeking an offset against a money judgment has the burden of proving the offset'"]), B&V can prevail in its substantial evidence challenge only if it meets the "extremely high burden" of showing that the evidence introduced at trial compels a finding as a matter of law that B&V should have been awarded the back charges it sought (*Estes v. Eaton Corp.* (2020) 51 Cal.App.5th 636, 651).

B&V carried that extremely high burden in this case. Rados's own pay applications indicate that Rados was paid for 100% of the spoils removal, and it is uncontradicted that B&V had to pay $1.2 million to have the spoils removed after the Subcontract was terminated (because Rados did not actually complete the removal).[12] In response, Rados does not contest that B&V had to pay another subcontractor to remove spoils; instead, Rados argues that *it* was not fully paid to do so and, in support of that argument, ignores its own witness's concession that Rados was paid and points to testimony by B&V's expert indicating, on cross-examination, that Rados was "more than likely paid for that work." In Rados's view, the expert's testimony was equivocal and thus means that the jury could have reasonably found Rados was *not* paid for the work. But Rados's own records, which indicate that Rados *was* paid for the work, were uncontradicted and confirmed by Rados's witnesses; what is more, the expert's

---

[12] The actual amount was greater, but B&V's insurer covered $1 million of those costs.

testimony does not contradict or undermine that evidence in any way (and the jury's power to reject an expert's testimony in whole or in part (*Howard v. Owens Corning* (1999) 72 Cal.App.4th 621, 632) does not entitle the jury to reject unconverted evidence that an expert repeats).  Thus, the uncontroverted evidence compels as a matter of law the finding that B&V was entitled to recoup the amount it paid the new subcontractor for removal of the spoils.  The evidence that B&V had to pay for new piping it had already paid Rados to acquire was also uncontradicted and also came from Rados's pay applications; Rados does not address the jury's finding in this regard at all in its briefs on appeal, so provides no basis to ignore the controverted evidence on this particular back charge.

Thus, in the new trial on damages on remand, the jury is to be instructed that B&V is entitled to an offset of back charges in the amount of $2,454,832.

### B.    *Prompt payment penalties*

Rados brought a cause of action seeking to obtain statutory prompt payment penalties against B&V of two percent of the amount due and owing to Rados, *per month*, beginning from the date Cal Water settled all of claims with B&V (that is, from November 2022).  The trial court did not submit that cause of action to the jury, and instead invited and granted a directed verdict for B&V on that cause of action on the ground that Rados had abandoned it, as it was nowhere in Rados's trial brief or on the verdict form the parties jointly proposed.  A trial court has the authority to direct a verdict in a defendant's favor on a cause of action abandoned by a plaintiff, at least where the plaintiff has evinced a "clear, unequivocal and express intent to abandon." (*Kaufman & Broad Building Co. v. City & Suburban Mortgage*

27

*Co.* (1970) 10 Cal.App.3d 206, 213.) Although we review de novo a trial court's grant of a directed verdict (*O'Shea v. Lindenberg* (2021) 64 Cal.App.5th 228, 235), we review any subsidiary factual questions for substantial evidence (*In re White* (2020) 9 Cal.5th 455, 470).

We need not examine whether substantial evidence supports the trial court's finding that Rados abandoned its cause of action for prompt payment penalties because, even if we assume the court erred in directing a verdict on that cause of action, that error was not prejudicial because there was a "good faith dispute" over the amount B&V owed Rados for its final payment upon termination, which precludes an award of prompt penalty penalties as a matter of law.

California law obligates general contractors to pay their subcontractors progress payments and to pay out any funds retained within a statutorily specified number of days after the general contractor receives payment from the project's owner. (Civ. Code, §§ 8802, subd. (b) [21-day period for progress payments when owner is "public utility"], 8814, subd. (a) [10-day period for retention payments]; Pub. Contract Code, §§ 10262, 10262.5, subd. (a) [7-day period for progress payments], 7107, subd. (c) [60-day period for retention payments by "public entity"]; Bus. & Prof. Code, § 7108.5, subd. (a) [7-day period for progress payments]; see generally *Tesco Controls, Inc. v. Monterey Mechanical Co.* (2004) 124 Cal.App.4th 780, 803-804 [periods "triggered" when "the general contractor actually receiv[es] a progress payment"].) Failure to do so subjects the general contractor to a statutory penalty of two percent of the amount not paid *per month*, starting from the date the payment was due under these statutes. (Civ. Code, § 8802, subd. (c); Pub.

Contract Code, § 10262.5, subd. (a); Bus. & Prof. Code, § 7108.5, subd. (b).)  The purpose of these prompt payment statutes—and the prompt payment penalty that enforces them—is "to protect the right to fair compensation for contractors, laborers, and suppliers" and thus "to discourage owners and direct contractors from withholding monies owed as a way of granting themselves interest-free loans." (*United Riggers & Erectors, Inc. v. Coast Iron & Steel Co.* (2018) 4 Cal.5th 1082, 1088, 1092 (*United Riggers*).)  Because that purpose is not implicated when the contractor and subcontractor have a good faith dispute "directly relevant to the specific payment that would otherwise be due," these statutes preclude the imposition of any prompt payment penalty when there is a "good faith dispute" over "all or part [or portion] of the amount due." (*United Riggers*, at pp. 1085, 1092; Civ. Code, §§ 8802, subd. (b), 8814, subd. (c); Pub. Contract Code, §§ 10262.5, subd. (a), 7107, subd. (e); Bus. & Prof. Code, § 7108.5, subd. (a).)

Here, B&V and Rados were engaged in a "good faith dispute" over the amount of money owed upon the termination of the Subcontract, arising from a dispute about whether Rados's termination was "for cause" or "without cause" as well as a dispute about the meaning of the Subcontract.  They sued each other; prosecuted a five-week trial at which they presented competing and legally tenable arguments to the jury about what amount was owed; and after the jury rendered its verdict and a post-trial motion was denied, appealed to this court.  In short, the parties had an objectively viable good faith dispute that precludes the award of any prompt payment penalties as a matter of law. (Accord, *Denver D. Darling, Inc. v. Controlled Environments Construction, Inc.* (2001) 89 Cal.App.4th 1221, 1241 [a "bona fide

29

dispute [between a contractor and subcontractor] as to the meaning of [their contract]" constitutes a "good faith dispute" over liability for prompt payment penalties].)

Rados resists this conclusion with four arguments.

First, Rados argues that the jury's verdict in its favor resolved the dispute, retroactively rendering a dispute not one in good faith. This argument is nonsensical, for if that were the test, then every dispute resolved at trial would never be a good faith dispute—and the statutory exemption for good faith disputes would be rendered a nullity. We are not allowed to wipe statutory language off the books. (*Knapp v. Ginsberg* (2021) 67 Cal.App.5th 504, 532 ["We aim to avoid constructions that render portions of a statute superfluous"].)

Second, Rados contends that B&V harbored a pretextual reason for terminating the Subcontract, and that B&V's malicious motive for terminating the contract precludes a finding of any good faith dispute over the amount owed upon termination. Although, as Rados points out, the courts are presently divided over whether the "good faith" in a "good faith dispute" is to be evaluated objectively or subjectively (compare *FEI Enterprises, Inc. v. Yoon* (2011) 194 Cal.App.4th 790, 799-806 ["good faith dispute" means "the bona fide existence of an actual legal dispute over the amount due under a construction contract"] with *Alpha Mechanical, Heating & Air Conditioning, Inc. v. Travelers Casualty & Surety Co. of America* (2005) 133 Cal.App.4th 1319, 1339 ["good faith dispute" "'suggests a moral quality; its absence is equated with dishonesty, deceit or unfaithfulness to duty'"]), the cases adopting the position that good faith is to be adjudged subjectively do so in the context of a case where one of the litigants *has* a subjectively good faith belief

30

that a different amount is owed even though that view is not objectively reasonable (*Alpha Mechanical*, at p. 1340). No case has yet held that an objectively reasonable dispute over the amount owed can be subject to prompt payment penalties merely because the party against whom the penalties are sought is shown to have a subjectively malicious motive for terminating the underlying contract. We reject such a view, as it is inconsistent with the *purpose* of these penalties, which is to impose penalties on general contractors who have no basis to withhold payments—not to impose penalties on those who have a reasonable basis for doing so merely because, subjectively, they have a dastardly heart or mind. (Accord, *Ruline Nursery Co. v. Agricultural Labor Relations Bd.* (1985) 169 Cal.App.3d 247, 260, fn. 8 [person may "offer a reasonable basis" for their actions, "while not acting in [subjective] good faith"].) It also makes no sense when applied to the Subcontract at issue in this case, which explicitly permits the contractor to terminate the contract for *any* reason, dastardly or not.

Third, Rados argues that the jury's verdict in its favor means that the jury found B&V violated the covenant of good faith and fair dealing implicit in the Subcontract, and notes that the jury in this case was specifically instructed on the covenant of good faith and fair dealing. The implicit assumption of Rados's argument is that "good faith" means the same thing in the context of the "covenant of good faith and fair dealing" as it does in the context of a "good faith dispute." Rados is wrong. Context matters. The covenant plumbs whether a contracting party complied with its discretionary obligation to act in good faith when implementing a contract (*Carma Developers (Cal.), Inc. v. Marathon Development California, Inc.* (1992) 2 Cal.4th 342,

31

372), while "good faith dispute" plumbs whether the ensuing dispute over what is owed was a good faith dispute for purposes of awarding prompt payment penalties.  They are different inquiries with different purposes, and we decline to treat the phrase "good faith" as fungible—particularly when it would be inconsistent with the purpose of the good faith dispute exception to the prompt payment penalty statutes.

Fourth and finally, Rados argues that there is no dispute *at all* as to the amounts covered by the parties' stipulation, so that this subset of moneys owed is subject to prompt payment penalties.  (See *United Riggers*, *supra*, 4 Cal.5th at pp. 1089, 1098.)  Specifically, Rados asserts that penalties apply, at a minimum, to (1) the $3,000,000 "credit" B&V stipulated to on Rados extra-work claims, and (2) $1.8 million in retention payments B&V "stipulated" it "withheld and owed Rados."  We reject the assertion regarding retention payments because, contrary to what Rados represents, the stipulation does not contain any express or implicit concession by B&V that it "owes" Rados any retention payments; the stipulation merely recites what amounts B&V paid on each payment application and what amounts it retained.  Consistent with the plain text of the stipulation, B&V's liability for those payments remained very much in dispute at the trial.  And although, as noted above, the stipulation contains B&V's express concession that it "owes" Rados the $3,000,000 (or so) "credit" for extra-work claims, Rados is still not entitled to collect prompt payment penalties on that amount.  That is because the amount of those extra-work claims were disputed throughout the parties dealings and pre-trial litigation—up until the very eve of trial—and because the Subcontract authorized B&V to withhold payments owed to

32

Rados as an offset against the damages B&V sought to recover from Rados (had the dispute over whether Rados was terminated for cause been resolved in B&V's favor). B&V's decision to stipulate to resolve its liability as to a subset of payments right before trial that had—until that point—been the subject of a vigorous dispute and withheld pursuant to the terms of the Subcontract, did not wipe away the existence of a good faith dispute as to that subset, or as to the broader question of what the final payment between B&V and Rados should be.

\*     \*     \*

In light of our conclusion that a new trial on damages is required, the trial court's award of prejudgment interest, attorney fees and costs is necessarily vacated.

33

## DISPOSITION

The judgment is reversed and remanded for a new trial on damages, except as to the back charges of $2,454,832 owed to B&V; the judgment is affirmed in all other respects.  The parties are to bear their own costs on appeal.

NOT TO BE PUBLISHED IN THE OFFICIAL REPORTS.


_____, P. J.
HOFFSTADT


We concur:


_____, J.
KIM (D.)


_____, J.
KUMAR*

_____

\*      Retired Judge of the Superior Court of Los Angeles County, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.